[Cite as *State v. Burns*, 2019-Ohio-2663.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NOS. 2017-P-0096** <br> **2017-P-0097** |
| JAMES R. BURNS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeals from the Portage County Court of Common Pleas.
Case Nos. 2016 CR 00863 & 2017 CR 00061.

Judgment: Affirmed in part; reversed and vacated in part; remanded.


*Victor V. Vigluicci*, Portage County Prosecutor, and *Pamela J. Holder*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*Sean C. Buchanan*, Slater & Zurz, One Cascade Plaza, Suite 2210, Akron, OH 44308 (For Defendant-Appellant).


TIMOTHY P. CANNON, J.

{¶1} Appellant, James R. Burns, appeals from the December 18, 2017 judgment entry of the Portage County Court of Common Pleas finding him guilty on two counts of Grand Theft, felonies of the fourth degree, in violation of R.C. 2913.02(A)(3). We affirm in part and reverse and vacate in part the trial court's judgment, and the matter is remanded.

{¶2} Appellant Burns operates a construction company incorporated and doing business as Brookstone General Contractors by Design, Inc. ("Brookstone"). Initially, Burns was indicted on December 1, 2016, on three counts of Grand Theft and one count of Theft from a Person in a Protected Class. Subsequently, a second indictment was issued by the grand jury on January 31, 2017, for one count of Grand Theft.

{¶3} Each count of the indictments, tried together in Case No. 16-CR-0863 (4 counts) and Case No. 17-CR-0061 (1 count), relates to contracts for Burns to perform construction services for the alleged victims. However, each of the two counts of which Burns was convicted contains highly different facts and circumstances that are in dispute. For that reason, we present the facts with regard to each count separately.

**Case No. 16-CR-0863, Count 4 ("The Lassiter Count")**

{¶4} Ms. Kathy Lassiter contracted with Burns, d.b.a. Brookstone, in the fall of 2014 to build a house on property she owned in Portage County. This was an all-inclusive home construction agreement; as stated by Ms. Lassiter, the agreement was to "[b]uild us a house that we can move right in to." Ms. Lassiter was referred to Burns through Carter Lumber in Ravenna, Ohio.

{¶5} The contract required payment to be made in portions as work was done on the home. The original total contract price was for $107,798.99. The contract was signed on September 5, 2014; however, construction on the house did not begin until March 2015. There was no completion date established in the contract, although Ms. Lassiter claimed that the work was promised to be completed "by Thanksgiving, no later than Christmas."

2

**{¶6}** Various issues arose during the construction of the house based on the topography. Because of these issues, there were disputes between the parties as to the design, constant delays, and workmanship of the project. Among the issues was that Burns hired a subcontractor named Dennis Miller who dug the foundation too deep; drainage issues arose with the adapted crawlspace due to the lower elevation of the land. Burns also had issues receiving permits for the project.

**{¶7}** Burns attributed delays in construction to Ms. Lassiter's son, who was supposed to complete electrical work and took several months to do so. Burns also testified as to a major dispute regarding the design of the kitchen, whereby Ms. Lassiter insisted on a substantially more expensive design than called for in the contract for which she refused to pay any extra money. In short, the full payment for constructing the kitchen under the original contract was to be $7,000.00; however, the kitchen cabinets alone selected by Ms. Lassiter were over $8,000.00. Ms. Lassiter wrote Burns a check for $8,000.00 to purchase the kitchen cabinets, but the money was never used for that purpose. Burns claims that the kitchen dispute is what led to his termination as contractor on the project, but Ms. Lassiter denies ever terminating Burns.

**{¶8}** Ms. Lassiter also complained about the quality of the work done; however, she did not produce any evidence to substantiate her claim. She testified that she was told evidence of the work quality was not necessary because "this isn't a civil case." Burns produced photographic evidence that contradicted her claims of poor workmanship.

**{¶9}** As far as completion, Brookstone successfully set a foundation, erected framing and a roof without gutters, windows, siding, rough plumbing, and shingling. Construction occurred starting in March 2015 and continuing until October 2015.

{¶10} Burns testified that in October 2015, Ms. Lassiter's boyfriend, Lee Stouffer, confronted Burns about the lack of progress on the project. Soon thereafter, Burns sent two workers to retrieve all the tools and other property left at the site, including property that should not have been taken and was later returned. The parties dispute whether Burns was terminated by Lee Stouffer, on behalf of Ms. Lassiter, before having his tools and other equipment retrieved from the project site following the confrontation. Mr. Stouffer did not testify.

{¶11} Thereafter, Ms. Lassiter hired a new contractor, and the house was completed in approximately seven months. She also hired an attorney who drafted a demand letter seeking to settle with Burns. Ms. Lassiter was notified two or three days later that Burns had filed for bankruptcy. She testified that she did not participate as a creditor in the bankruptcy because, ". . . it was just a joke . . . And we know that he has pulled this off on several different people . . . We felt it was gonna be a waste of time." Further, her testimony indicated that no civil action was pursued because Ms. Lassiter mistakenly believed that the contract for the project required her to pay Burns' attorney fees for a civil lawsuit.

{¶12} Ms. Lassiter paid a total of $81,814.65 out of the $107,798.99 contract price to Burns for the construction. This included a check for $8,000.00 written on August 14, 2015, for kitchen cabinets that were never ordered. Burns never used the $8,000.00 on kitchen cabinets. He claims to have used the money towards completion of the house prior to being terminated. Ms. Lassiter paid a total of $61,997.29 to the second contractor to have the house completed. She therefore paid a total of $36,021.95 over the amount contracted to be paid to Burns to build the house.

4

**Case No. 17-CR-0061, Count 1 ("The Parker Count")**

{¶13} Mrs. Beverly Parker contracted with Burns, d.b.a. Brookstone, in approximately December 2013 to construct an addition, basement with bathroom, deck, and kitchen on property she owned in Copley, Ohio. The kitchen was the main focus of the project: Mrs. Parker had recently retired from her position as a middle school principal in 2013 and was planning to use a lump sum distribution from her 403(b) retirement funds to purchase her "dream kitchen," which would reduce her retirement payments permanently. Mrs. Parker was referred to Burns by a friend, who had his entire home renovated by Burns. The friend invited Mrs. Parker to see the work, and she was very impressed with what Brookstone had done.

{¶14} The contract required payment to be made in portions as work was done on the project. The original total contract price was for $74,453.00. There was no completion date established in the contract, although Mrs. Parker testified that she was emphatic that a quick completion of the kitchen was important. This was because her husband had undergone triple bypass surgery and a major concern was being able to strictly control his diet—which would be extremely difficult without a functioning kitchen. Burns offered to construct a temporary kitchen free of charge for the construction period, but Mrs. Parker declined. The parties also agreed that Mr. Parker, following his recovery from surgery, would complete some of the electrical wiring, as he was a licensed electrician.

{¶15} As far as completion, Brookstone successfully completed all the major exterior modifications needed. The interior renovations were eventually completed to the extent that cabinets were ready to be placed in the kitchen; however, the kitchen cabinets were never installed. While Mrs. Parker paid Burns for the kitchen cabinets directly, they

5

were never even ordered. The series of events concerning the kitchen cabinets was the main focal point of Mrs. Parker's theft claim. Those facts and circumstances are not disputed and are as follows:

{¶16} Mrs. Parker and Burns met at the Wooster, Ohio Lowe's in January 2014 to place an order for cabinets based on a previous quote of $31,235.03. After going into the store and planning the order, Burns instructed Mrs. Parker to give him the money for the cabinets because he received a discount as a contractor. The checks written to Burns by Mrs. Parker were made out in amounts just under $10,000.00 each, totaling the full amount for the cabinets, at Burns' request. Burns explained that he had a common practice of requesting smaller checks—specifically under the $10,000.00 threshold—so that they would not be subject to a bank hold.

{¶17} At the time Burns received the money, he claims that the project had just started and that a foundation for the project was not even set. Because he deemed it premature, Burns never placed an order for the kitchen cabinets. Burns deposited the checks in Brookstone's bank account at a bank in Kent, Ohio over the next two days. The bank account in which the checks were deposited was overdrawn and accruing overdraft fees at the time the checks were deposited.

{¶18} Mrs. Parker initially expected about a six-week delivery time for the cabinets; however, she grew more concerned as the six weeks came and went. Text messages presented at trial showed that Burns assured her several times that the cabinets were ordered, that they were on the way, and that any further delay must be an issue with the manufacturer (KraftMaid). He also claimed that the delay was due to the cabinets being damaged during shipping previously. When Mrs. Parker eventually

6

contacted KraftMaid directly, they indicated that no order had been placed for the style of cabinets Mrs. Parker was claiming had been ordered and that Burns had not placed an order from KraftMaid in over a year. When Mrs. Parker informed Burns of the discussion she had with the manufacturer, he continued to insist that the cabinets were ordered, even encouraging her to place a complaint with the attorney general—which she did in October 2015—despite Burns knowing that he had never placed the cabinet order. Thereafter, Mrs. Parker was forced to reorder the cabinets and purchase them from Lowe's in December 2015. She took out a line of credit to do so.

{¶19} At trial, Burns stated that the cabinets were not ordered because there would have been nowhere to mount them until the kitchen renovations were complete. He claimed that a need for drywalling, placement of a window, flooring issues, and mechanical installation delayed the completion of the kitchen. Also, Mrs. Parker's husband—who was going to do some of the electrical wiring to save money—had bypass surgery at the time of the construction, and Burns claimed that his recovery delayed the completion of the kitchen.

{¶20} Finally, Burns claimed that an issue with Mrs. Parker's ability to pay for the completed work arose and he had reason to believe that she was not going to be able to pay for the renovations in full. Essentially, Burns stated that he was holding the funds for the unordered cabinets, which he used to pay other obligations and no longer had, as collateral to ensure payment for the project. Mrs. Parker testified that she was holding off on making further payments and was not going to give Burns any additional funds until the cabinet issue was resolved. Burns testified that he was owed approximately $22,000.00 when he ceased work on the project. He never used the $31,235.03 on the

7

kitchen cabinets. Despite his multiple explanations for holding off on ordering the cabinets—including the alleged payment dispute—Burns never separated the funds for the kitchen cabinets into an escrow account or otherwise held the funds independent from all other project funds. He claims to have used the money on completing the project prior to ending construction on the kitchen due to non-payment.

**Investigations**

{¶21} Following Burns' bankruptcy filing in December 2015, Burns' conduct was reported to the Portage County Sheriff's Office in January 2016. As a result, Detective John Lavrich ("Lavrich") began an investigation into Burns in which he identified Ms. Lassiter as a potential victim from Burns' bankruptcy filing. Lavrich contacted her in November 2016 and compiled paperwork and receipts detailing the ongoing construction services provided by Burns before the bankruptcy filing.

{¶22} On June 30, 2016, criminal investigator Kimberly Kepling ("Kepling") with the Ohio Attorney General's office was assigned to investigate the complaint Mrs. Parker had filed on October 28, 2015 regarding her kitchen cabinets. Kepling conducted a parallel investigation with Lavrich's investigation into the first four alleged victims. With regard to Mrs. Parker, Kepling's investigation revealed the timeline of events discussed above.

{¶23} Further, in the course of her investigation, Kepling subpoenaed Burns' banking records from December 2013 and January 2014. These records revealed that the bank account for Brookstone had a balance deficit of $891.58 as of December 31, 2013, and was incurring continuous overdraft fees. It had a similar negative balance at

8

the time Burns deposited the checks Mrs. Parker wrote for the cabinets at the Kent, Ohio branch of First Merit Bank.

**Trial**

{¶24} The matter was set for a bench trial on September 26, 2017, which lasted two days.

{¶25} At the end of trial on September 29, 2017, the trial court found Burns not guilty on three of the five counts. He was found guilty on the Lassiter Count and the Parker Count. Burns was then sent for a presentence investigation through the Adult Probation Department.

{¶26} A restitution hearing was held on December 11, 2017, and a sentencing hearing was held on December 12, 2017.

{¶27} Burns was ordered to pay Ms. Lassiter the amount of $36,021.95, representing the difference between the contracted price for performance of construction services and the additional costs associated with finishing the projects after Burns declared bankruptcy.

{¶28} Burns was ordered to pay Mrs. Parker the amount of $33,991.00, representing the full amount of the checks for kitchen cabinets paid by Mrs. Parker to Burns. Further, Burns was sentenced to 90 days in the Portage County Jail, followed by 12 months of intensive supervised probation and 36 months of basic probation.

**Appeal**

{¶29} Burns filed a timely notice of appeal and raises three assignments of error. For clarity and convenience, we combine and consider the assignments out of order as necessary.

{¶30} Burns' third assignment of error states:

{¶31} "The court erred by finding the defendant guilty over the manifest weight of the evidence."

{¶32} "In determining whether the verdict was against the manifest weight of the evidence, ' * * *[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.* * * '" (Citations omitted) (Emphasis sic.) *State v. Sullivan*, 11th Dist. Lake No. 2017-L-031, 2017-Ohio-8806, ¶13, citing *State v. Schlee*, 11th Dist. Lake No. 93-L-082, 1994 WL 738452, *5 (Dec. 23, 1994). A judgment of a trial court should be reversed as being against the manifest weight of the evidence "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶33} R.C. 2913.02(A)(3) provides:

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

* * *

(3) By deception[.]

{¶34} In *State v. Dalton*, 11th Dist. Portage No. 2008-P-0097, 2009-Ohio-3149, ¶31, this court held:

To prove 'a violation of R.C. 2913.02(A)(3), the State must demonstrate that at the time the defendant took the money he had no intent to repay the money or perform under the contract in exchange.' *State v. Coleman*, 2nd Dist. No. 2002-CA-17, 2003–

10

Ohio–5724, at ¶29 (citation omitted). 'The law recognizes that intent can be determined from the surrounding facts and circumstances, and persons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts.' *State v. Garner*, 74 Ohio St.3d 49, 60, * * * [ (1995) ]. (Parallel citations omitted).

{¶35} In support of his assignment of error, Burns argues that the state failed to prove the mens rea necessary for these crimes in both the Lassiter Count and the Parker Count. He offered several explanations at trial precluding a finding that he had no intent to perform the contract and precluding a finding that he intended to deprive the victims of their money. Among them, he stated that (1) it was premature to buy the kitchen cabinets when he accepted the money in each instance; (2) substantial work was done in each case, before and after the money for the cabinets was received; (3) issues arose regarding contractual duties on behalf of the victims to complete work, which led to delays; and (4) payment concerns arose, which led to Burns holding the money designated for kitchen cabinets while awaiting further payment under the contracts.

{¶36} The Second Appellate District in *State v. Coleman*, 2d Dist. No. 2002-CA-17, 2003-Ohio-5724, is particularly applicable to the case sub judice. Mr. Coleman was convicted of four counts of theft for failing to complete roofing jobs. *Id.* at ¶1-2. The court of appeals evaluated each instance independently and reversed three of the four convictions. *Id.* at ¶34, 38 & 41. Factors supporting reversal included whether extensive work had been done on the project; whether materials were obtained to complete the job; whether the defendant had attempted to order the required materials; and whether the defendant attempted to return the down payment received for materials when the homeowner cancelled the contract. *Id.* at ¶31, 36-37 & 40. The court of appeals only

11

affirmed the fourth conviction, wherein the defendant had accepted money from the homeowner but never did any work or ordered any materials. *Id.* at ¶43.

{¶37} With regard to the Parker Count, Burns never ordered the kitchen cabinets. He had Mrs. Parker pay him directly for the cabinets when his bank account was overdrawn. Burns knew, or should have known as the account holder, that the deposited funds would be partially consumed by the overdraft fees and were therefore instantly unavailable to purchase the kitchen cabinets upon deposit. However, his intent can be inferred, among other things, because he never ordered the cabinets.

{¶38} In further support of his fraudulent scheme to permanently convert the funds to his own, Burns continuously lied about ordering the cabinets, and created various excuses for why their delivery was delayed. He even encouraged Mrs. Parker to contact the Ohio Attorney General's office—which would very likely lead to an investigation determining that the cabinets were never ordered—rather than admit that he had lied about placing the order. Contrary to his excuse regarding nonpayment, at the time Burns accepted and deposited the money from Mrs. Parker in January 2014, there was no reason to be concerned about Mrs. Parker's ability to pay for the contracted services.

{¶39} Under those circumstances, the evidence supports the conclusion that Burns had no intent to purchase the kitchen cabinets with the money he solicited from Mrs. Parker. The money was instead used to remedy Brookstone's overdrawn bank account. He continued to deceive and mislead Mrs. Parker as to the status of her cabinets for a series of months, in violation of R.C. 2913.02(A)(3). Burns' conviction on the Parker Count is not against the manifest weight of the evidence.

{¶40} With regard to the Parker Count, the dissenting opinion suggests that the evidence presented at trial did not establish beyond a reasonable doubt that Burns intended to commit theft. It is agreed that the state's obligation was to prove Burns' intent at the time he accepted the money for the cabinets. It is also agreed that this is a determination to be made by the trier of fact.

{¶41} There is a presumption that the findings of the trier of fact are correct because the trier of fact has had the opportunity "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Smith v. Evaline's Bridal*, 11th Dist. Trumbull No. 2009-T-0014, 2009-Ohio-6520, ¶13, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984); *see also* 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191–192, (1978) (" * * * [I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * * If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.").

{¶42} The trial court was entitled to assess the credibility of the testimony and evidence and ultimately conclude that Burns and his explanation of events was less credible and that he never intended to purchase the cabinets for Mrs. Parker. *See Karnofel v. Watson*, 11th Dist. Trumbull No 99-T-0052, 2000 Ohio App. LEXIS 2770, *3 (June 23, 2000) (determinations as to the credibility of witnesses and the weighing of

evidence are tasks "for the trier of fact, not the appellate court"); *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 23 (1990).

{¶43} With regard to the Lassiter Count, Burns again never ordered the kitchen cabinets. However, he was in the process of building an entire house under the contract with Ms. Lassiter. Testimony indicated that, when the cabinet money was paid on August 14, 2015, the house was "just a shell" and Brookstone had just started working on the kitchen. Further, the relationship between the parties broke down shortly thereafter with Burns allegedly either walking off the project or being terminated over a dispute regarding the design of the kitchen in October 2015, about two months before declaring bankruptcy. Regardless, Burns and Ms. Lassiter terminated the contractual arrangement after substantial and ongoing work was completed. At that time, Burns had received approximately 76% of the contract price for work he had actually done under the contract.

{¶44} Unlike the Parker Count, much of the evidence supporting a finding of criminal intent is absent in the Lassiter Count. The cabinet money was offered at the solicitation of the client, not Burns. Also, no bank account records were presented to demonstrate whether the account where the funds were deposited in August 2015 was overdrawn. Further, the series of lies and deceit regarding the status of the ordering that was demonstrated through text correspondence between Burns and Mrs. Parker is not present in the Lassiter Count. Finally, even while the parties dispute how the contractual relationship ended, there is no dispute that Burns was no longer Ms. Lassiter's contractor for the home after October 2015. The lack of evasiveness and refusal to continue performing before the fallout weigh against the prosecution in proving beyond a reasonable doubt that Burns intended to commit theft at the time he received the kitchen

14

cabinet money.  *See generally State v. Dalton*, 11th Dist. Portage No. 2008-P-0097, 2009-Ohio-3149, ¶33 ("By accepting payment in full, performing minimally on the contract, and avoiding contact with [victim], it is reasonable to infer that [accused] intended to deprive her of her money by deception . . .").

**{¶45}** The evidence does not support the conclusion that, at the time he was given the money on August 14, 2015, Burns had no intention to purchase kitchen cabinets and intended to permanently deprive Ms. Lassiter of the funds.  Burns' conviction on the Lassiter Count is against the manifest weight of the evidence.  To the extent that Burns was either overcompensated or undercompensated by Mrs. Lassiter under the contractual arrangement is a civil matter.

**{¶46}** Appellant's third assignment of error is without merit with regard to the Parker Count.  Appellant's third assignment of error has merit with regard to the Lassiter Count.

**{¶47}** Appellant's first assignment of error pertains to the order of restitution, and states:

**{¶48}** "The court erred by relying [on] lay testimony regarding the construction work performed and allegedly not performed."

**{¶49}** The Ohio Supreme Court has stated that " . . . an order of restitution imposed by the sentencing court on an offender for a felony is part of the sentence . . ." *State v. Danison*, 105 Ohio St.3d 127, 2005-Ohio-781, ¶8.  Accordingly, our standard of review for modifying a sentence, including the restitution order, is set forth in R.C. 2953.08(G)(2):

15

The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.

The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard of review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

{¶50} ". . . appellate courts 'may vacate or modify any sentence that is not clearly and convincingly contrary to law' only if the appellate court clearly and convincingly finds that the record does not support the sentence." *State v. Wilson*, 11th Dist. Lake No. 2017-L-028, 2017-Ohio-7127, ¶18, quoting *State v. Price*, 8th Dist. Cuyahoga No. 104341, 2017-Ohio-533, ¶14, quoting *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶23.

{¶51} Burns did not argue at the hearing and does not argue on appeal that an order of restitution is improper if the convictions are upheld. The only challenge to the restitution order is as to the amount, and whether the amount needed to be supported by some form of expert testimony or verification. Therefore, the restitution order for the Lassiter Count is vacated consistent with our opinion above. Only the restitution order in the Parker Count is considered.

{¶52} R.C. 2929.18 governs the issuance of financial sanctions on felony offenders. That statute states, in pertinent part:

16

(A) Except as otherwise provided in this division and in addition to imposing court costs pursuant to section 2947.23 of the Revised Code, the court imposing a sentence upon an offender for a felony may sentence the offender *to any financial sanction or combination of financial sanctions* authorized under this section or, in the circumstances specified in section 2929.32 of the Revised Code, may impose upon the offender a fine in accordance with that section. Financial sanctions that may be imposed pursuant to this section include, but are not limited to, the following:

(1) Restitution by the offender to the victim of the offender's crime or any survivor of the victim, *in an amount based on the victim's economic loss.* If the court imposes restitution, the court shall order that the restitution be made to the victim in open court, to the adult probation department that serves the county on behalf of the victim, to the clerk of courts, or to another agency designated by the court. If the court imposes restitution, at sentencing, the court shall determine the amount of restitution to be made by the offender. If the court imposes restitution, *the court may base the amount of restitution it orders on an amount recommended by the victim, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information,* provided that the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense. If the court decides to impose restitution, the court shall hold a hearing on restitution if the offender, victim, or survivor disputes the amount. All restitution payments shall be credited against any recovery of economic loss in a civil action brought by the victim or any survivor of the victim against the offender. [Emphasis added.]

{¶53} Thus, the plain language of the statute does not require expert testimony to be considered when imposing a restitution sanction. To the contrary, the statute explicitly authorizes the trial court to consider "an amount recommended by the victim, the offender, a presentence investigation report, [and] estimates or receipts indicating the cost of repairing or replacing property, and other information." All of the aforementioned were presented at trial and considered by the trial court. The victims each recommended an amount that would leave them whole, as if the contract were fully performed or the kitchen cabinets were ordered as promised. The trial court accepted receipts and quotes into

17

evidence to review. It also ordered a presentence investigation to be conducted for consideration.

**{¶54}** Burns points to instances where an expert is required to prove civil damages. However, criminal restitution is a distinct and separate concept from civil damages, with the former being governed by R.C. 2929.18. Nothing in that statute mandates, or even suggests, that expert testimony shall be considered by the trial court in ordering restitution. R.C. 2929.18 specifically permits a trial court to rely on lay testimony. As we have determined, there is evidence that supports the conviction related to the funds that were taken from Mrs. Parker for purchase of the cabinets. Therefore, we do not clearly and convincingly find that the record does not support the restitution order.

**{¶55}** Appellant's first assignment of error has no merit.

**{¶56}** Appellant's second assignment of error states:

**{¶57}** "The verdict was based on insufficient evidence."

**{¶58}** The issue presented for review and argument for this assignment of error states: "Did the court err by denying the defendant's Rule 29 motions when the state had failed to produce sufficient evidence for a conviction?"

**{¶59}** "A Crim.R. 29 motion challenges the sufficiency of the evidence presented by the state." *Sullivan*, *supra*, at ¶28, citing *State v. Wireman*, 4th Dist. Pike No. 01CA662, 2002 WL 971842, *2 Apr. 2, 2002).

**{¶60}** "A challenge to the sufficiency of the evidence raises a question of law as to whether the prosecution met its burden of production at trial." *State v. Bernard*, 11th Dist. Ashtabula No. 2016-A-0063, 2018-Ohio-351, ¶56, citing *Thompkins*, *supra*, at 390

18

and *State v. Windle*, 11th Dist. Lake No. 2010-L-033, 2011-Ohio-4171, ¶25. "'In reviewing the record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."'" *Id.*, quoting *State v. Smith*, 80 Ohio St.3d 89, 113 (1997), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Where there is insufficient evidence, a conviction will be vacated. *Id.* at ¶55, citing *State v. Rose*, 11th Dist. Lake No. 2014-L-086, 2015-Ohio-2607, ¶32.

**{¶61}** A finding that a judgment is not against the manifest weight of the evidence necessarily means the judgment is supported by sufficient evidence. *State v. Arcaro*, 11th Dist. Ashtabula No. 2012-A-0028, 2013-Ohio-1842, ¶32. Having determined that Burns' conviction under the Parker Count is not against the manifest weight of the evidence, it follows that it is supported by sufficient evidence.

**{¶62}** However, as discussed above, the evidence supporting a finding of criminal intent is absent in the Lassiter Count. The cabinet money was offered at the solicitation of the client, no bank account records were presented at trial, the lies and deceit evident in Mrs. Parker's circumstances were absent in Ms. Lassiter's circumstances, and there is no dispute that the parties terminated the contractor relationship after disputes over money arose in October 2015, independent of the kitchen cabinets.

**{¶63}** Overall, the evidence is not sufficient to support the conclusion that, at the time he was given the money on August 14, 2015, Burns had no intention to purchase kitchen cabinets and intended to permanently deprive Ms. Lassiter of the funds. Burns' conviction on the Lassiter Count was based on insufficient evidence.

{¶64} The second assignment of error lacks merit with regard to the Parker Count and has merit with regard to the Lassiter Count.

**Conclusion**

{¶65} The judgment of the Portage County Court of Common Pleas is affirmed with regard to the Parker Count.

{¶66} The judgment is reversed, and Burns' conviction is vacated with regard to the Lassiter Count.

{¶67} The matter is remanded for resentencing consistent with this opinion.

MARY JANE TRAPP, J., concurs,

MATT LYNCH, J., concurs in part and dissents in part with a Dissenting Opinion.

_____

MATT LYNCH, J., concurs in part and dissents in part with a Dissenting Opinion.

{¶68} I concur in the majority's analysis and judgment with regard to the vacation of Burns' conviction for the Lassiter count, since he completed extensive work on that project and there was no demonstration of intent to commit theft. I dissent, however, as to the decision to affirm Burns' conviction for theft on the Parker count. A thorough review of the record demonstrates a deficiency in evidence proving Burns had intent to commit theft upon receipt of the payment for the cabinets. Given the absence of evidence as to this critical element, Burns' conviction for the Parker count should be reversed.

{¶69} It is critical to closely examine the issue of Burns' intent, since accepting money for a construction project and a subsequent delay in utilizing that money in the

20

completion of the job does not support a conviction for theft in the absence of evidence showing no intent to perform the contract. Theft by a contractor can only be supported by the evidence if the State proves that "*when the defendant-contractor took the money*, he had no intent to repay it or to perform the work under the contract." (Emphasis added.) *State v. Wallace*, 11th Dist. Ashtabula No. 2016-A-0008, 2016-Ohio-8515, ¶ 56. The facts that most strongly prove intent necessarily arise from the conduct and circumstances present when the payment is made since they accurately demonstrate the defendant's intent at that time. Here, there is simply a lack of evidence to demonstrate Burns intended to commit an act of theft.

{¶70} The evidence cited by the majority in support of the conviction relates primarily to two actions: Burns' acceptance and deposit of Parker's payment into an overdrawn bank account and his alleged deception in subsequent discussions regarding whether he had purchased cabinets with those funds.

{¶71} First, the majority relies heavily on the fact that Burns' business bank account was overdrawn at the time he requested the payment from Parker, assuming that he knew his account was overdrawn and this payment was sought to cover his overdraft rather than purchase cabinets. This argument requires making inferences that are not supported by the evidence and go far over and above those permissible to find a defendant guilty beyond a reasonable doubt. While it is accurate that Burns' business account was overdrawn when he deposited Parker's checks, there is nothing in the record to show he was either aware of this or deposited the money for the purpose of remedying this problem. The only evidence regarding such knowledge was Burns' testimony that he had several accounts and was unaware that this one was overdrawn.

21

{¶72} Furthermore, an examination of the account records demonstrates that there were consistent fluctuations within the account over time. In December of 2013, Burns had a positive balance of almost $10,000 and only became overdrawn on the 26th, a few weeks before he deposited Parker's checks. At the time of those deposits, which totaled over $30,000, his account was only about $1,000 in the negative. Just four days after the Parker deposits, Burns deposited another $4,000 in unrelated funds. The bank records demonstrate that Burns had a typical account of a contractor which underwent various fluctuations over time based upon payments and expenses. It is an unreasonable inference to assume Burns intended to receive over $30,000 in funds to remedy an overdraft in the amount of only $1,000, especially one that would have been cured by separate deposits just a few days later.

{¶73} As to the issue of Burns' subsequent dishonesty regarding whether he purchased the cabinets, this also carries little weight. It does not demonstrate that Burns accepted the payment with the intent to never purchase the cabinets. Rather, it indicates a lack of follow through on timely completing the job and questionable professionalism in communicating with the client. This court should not uphold a conviction based on bad business practices rather than intent to commit a crime. Civil remedies exist for parties to receive full compensation when there are conflicts over the timing or quality of a contractor's work. "The civil law provides adequate remedies for breached contracts" in instances where the "evidence does not show that defendant intended to deprive the complaining witness of his property in a culpable manner." *Orange Village v. Woolfolk*, 8th Dist. Cuyahoga No. 77451, 2000 WL 1474506, *2 (Oct. 5, 2000).

**{¶74}** The majority asserts as evidence of Burns' alleged deception that he told Parker to contact the Attorney General's Office with complaints about the cabinets. Logically, however, this only buttresses the argument that Burns was not acting with intent to steal from Parker, as he did not seek to avoid an investigation into his conduct but, rather, encouraged it. If Burns was committing a theft, it would be highly unlikely he would recommend that the victim initiate an investigation into his conduct.

**{¶75}** In addition to there being serious flaws in the foregoing justifications to support a conviction, there are additional facts demonstrating a lack of intent. Importantly, this is not the type of case in which a contractor took money from a client "and was never heard from again," which would warrant a conviction. *State v. Waiters*, 8th Dist. Cuyahoga No. 91586, 2009-Ohio-1251, ¶ 20, *citing State v. Belt,* 3d Dist. Union No. 14-03-36, 2004-Ohio-1511, ¶ 25. It was clear from the testimony of both Burns and Parker that he did extensive work in her home, which included constructing an addition, basement, and a deck, and completing foundation work and kitchen renovations. Several appellate districts have held that the completion of portions of a project, although total completion was disputed, did not give rise to a criminal conviction and have been reluctant to find a conviction supported by the weight of the evidence when the defendant performed work on the project for which he was paid. *See Waiters* at ¶ 20 (where a dispute between parties prevented the contractor from completing the work, this was not sufficient to demonstrate that he had no intent to perform when he accepted payment); *State v. Chait*, 9th Dist. Medina No. 12CA0011-M, 2012-Ohio-6104, ¶ 21.

**{¶76}** While it is accurate that separate payments were made and designated for the cabinets apart from the other work completed in the kitchen, it is implausible to

23

conclude Burns intended to steal only the money for the cabinets when he had been working on the entire project. Credible justifications for the delay in purchasing the cabinets were presented through testimony demonstrating Parker's husband's illness had delayed the completion of necessary electrical work in the kitchen and extensive work on the addition was still underway, both of which were prerequisites for cabinet installation. Parker also eventually refused to make certain payments due to the disputes in completion of the cabinet work. This again demonstrates that there were legitimate disagreements that would more properly be resolved in a civil suit.

{¶77} Finally, it is necessary to emphasize that, while the majority cites *State v. Coleman*, 2d Dist. Champaign No. 2002 CA 17, 2003-Ohio-5724, and its application of "factors supporting reversal" in theft cases involving construction work, there is no exclusive or exhaustive list of factors or test to be applied in these cases. Such matters are highly fact intensive and a determination of whether there is intent to commit theft should not be limited or constrained by any factors that may be relevant in one case but not another. This court should not feel compelled to give any particular weight to factors set forth by another district but should consider any and all relevant facts tending to prove or disprove the elements of theft.

{¶78} The majority emphasizes that the trier of fact is responsible for making credibility determinations and that this court must give deference to those decisions, a proposition which is an accurate statement of law. However, this should not be construed as limiting this court from considering credibility to the extent that it is a necessary criterion to weigh when conducting a manifest weight review. As explained in *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), a reviewing court must determine whether the

24

jury "clearly lost its way" and in doing so, acts as the "thirteenth juror" and "weighs the evidence and all reasonable inferences [and] considers the credibility of witnesses." (Citation omitted.) *Id.* at 387. This court must exercise its duty to fully review all of the evidence in reaching its determination rather than invariably deferring to the trier of fact's verdict.

**{¶79}** Regardless, a determination that Burns provided credible testimony is not necessary for reversal of his convictions as against the weight of the evidence. Rather, the conclusion that reversal is warranted is based primarily on the lack of credible evidence presented by the State on the element of intent. This lack of evidence, combined with the contrary evidence such as bank records showing only the fluctuating bank accounts of a contractor and the testimony of Parker herself that Burns had completed some of the work, demonstrates a lack of intent and supports the conclusion that the jury lost its way.

**{¶80}** For the foregoing reasons, since the weight of the evidence does not support a conclusion beyond a reasonable doubt that Burns had an intent to commit a theft offense, his conviction relating to the Parker count should be reversed. Thus, I must respectfully dissent in part.