OPINION
{¶ 1} Defendant-appellant, Anthony Batich, appeals his child endangering conviction from the Ashtabula County Court of Common Pleas. For the reasons that follow, we affirm.
 {¶ 2} Factual and Procedural Background *Page 2 
 {¶ 3} On the morning of November 5, 2004, when Rachel Vitale ("Rachel") left for work, she said goodbye to her two and one-half year old son, Jeramie Vitale, Jr. ("Jeramie"), unaware that when she returned her son would never be the same.
 {¶ 4} Rachel, who was separated from Jeramie's father, was living with appellant and was involved in a romantic relationship with him. Appellant watched Jeramie during the day while Rachel was at work. Somewhere around 4:30 p.m. on that day, when Rachel returned home from work, appellant told her that Jeramie had fallen down the stairs while carrying a toy. Rachel asked if Jeramie had hit his head during the fall and was told that he had not. Appellant told her that he had fed Jeramie dinner and had put him to sleep. Rachel went into Jeramie's room to check on him, and believing he was fine, decided not to interrupt his sleep.
 {¶ 5} Appellant went to work some time near 5:00 p.m. and returned home earlier than expected, around 8:30 p.m. At 9:30 p.m., Rachel told appellant she was going to sleep, but that she was first going to check on Jeramie to see if he wanted some juice to drink. Appellant told her that he would check on Jeramie and that she should go to sleep. Rachel woke up at 7:00 a.m. the next morning and took a shower after seeing that Jeramie was still asleep. After her shower, Rachel went into Jeramie's room and found appellant in the room trying to wake Jeramie up.
 {¶ 6} Rachel looked at Jeramie and noticed that Jeramie's eyes were half open and that he was making moaning noises. Recognizing the need for medical attention, Rachel told appellant they had to take Jeramie to the hospital. According to Rachel, appellant argued with her that Jeramie was just fine and that he was simply sleeping. *Page 3 
Appellant encouraged Rachel to go to work. Finally, according to Rachel, appellant relented, and they drove Jeramie to Brown Memorial Hospital.
 {¶ 7} Upon arriving at the hospital, a CAT scan of Jeramie's head was taken and the determination was made to life-flight Jeramie to Rainbow Baby and Children's Hospital ("RB C"), due to the seriousness of his injuries. Medical personnel at RB C discovered that Jeramie was unresponsive, in a coma, and that he had signs of severe brain injury. There was evidence of external trauma to the eye, a dilated left pupil, a subgaleal hematoma (confirmed by the CAT scan), and multiple bruises on his body, including bruises to his scrotum. Some of the bruises were yellow and brown in color, suggestive that they had been there for some time.
 {¶ 8} Surgery was performed to remove the two blood clots found in Jeramie's brain, one of which appeared to have been inflicted weeks earlier. Jeramie was placed in a medically-induced coma, and screws were placed in the side of his head to monitor the pressure in his brain. A post-operative CAT scan and MRI revealed that Jeramie had suffered an extensive stroke involving the left hemisphere of his brain after the blood clots were removed. Jeramie remained in pediatric intensive care for several weeks and was ultimately transferred to a rehabilitation hospital, where he remained for over three months.
 {¶ 9} After Jeramie was hospitalized, Officer William J. Fleischer of the Conneaut Police Department began his investigation and questioned appellant. When asked what happened on November 5, 2004, appellant told the officer that Jeramie had fallen down the stairs, while carrying a toy, at around 4:30 p.m., and that he had caught Jeramie before he hit the ground. Appellant said that after the fall, he rocked Jeramie to *Page 4 
sleep, and that he called Rachel and told her what happened before she came home. Rachel denied being told about the fall until she arrived home. After speaking with RB C physicians, the officer had an arrest warrant prepared and arrested appellant. Appellant denied shaking Jeramie and denied that Rachel had ever hurt Jeramie.
 {¶ 10} At trial, Dr. Alan Cohen ("Dr. Cohen"), Chief of Pediatric Neurosurgery at RB C, testified that Jeramie had suffered a life-threatening injury and that the pattern of the blood clot was indicative of a non-accidental trauma. In fact, in his medical opinion, the injuries to Jeramie's brain and body were not consistent with a fall down a flight of carpeted stairs. Rather, the injuries sustained were indicative of child abuse, or, more commonly referred to as "shaken baby syndrome." Because of the extensive injuries Jeramie sustained, he is unable to talk or walk unassisted and will be unable to live independently or hold a job. Dr. Cohen further testified that the injury to Jeramie's brain was significant and caused him to be cognitively impaired, to suffer from seizures, and to have weakness and spasticity.
 {¶ 11} Dr. Lolita McDavid ("Dr. McDavid"), Director of Child Advocacy and Protection at RB C, and Dr. Barabar Wechsler, a physician from the rehabilitation facility, reached the same medical conclusions as Dr. Cohen. Both physicians opined that the injuries Jeramie sustained were not consistent with a fall down five to six carpeted steps, but, rather were consistent with shaken baby syndrome.
 {¶ 12} The jury convicted appellant of one count of attempted murder, one count of felonious assault and one count of child endangering. Following a sentencing hearing, the court sentenced appellant to ten years on the attempted murder charge and eight years on the child endangering charge. *Page 5 
 {¶ 13} Appellant filed this timely appeal and raises the following two assignments of error for our review:
 {¶ 14} "[1.] The Ashtabula County Court of Common Pleas erred to the prejudice of appellant when it accepted the jury's verdict of guilty to count four of the indictment and sentenced appellant to a prison sentence of eight years on that count.
 {¶ 15} "[2.] Appellant was denied the effective assistance of counsel guaranteed him by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution."
 {¶ 16} In his first assignment of error, appellant argues that because Count Four of the indictment, child endangering, does not state the essential element of recklessness, the indictment was invalid and the trial court lacked jurisdiction as to Count Four.
 {¶ 17} Standard of Review
 {¶ 18} Of particular relevance to this appeal is the fact that appellant never raised this alleged error to the trial court. Therefore, we review this assignment of error under the plain error rule. Crim. R. 52(B). See, also, State v. Joseph (1995), 73 Ohio St.3d 450, 455 (where the Supreme Court of Ohio applied the plain error rule in a death penalty case where the defendant failed to challenge the sufficiency of the indictment at the trial court level.)
 {¶ 19} In State v. Barnes (2002), 94 Ohio St.3d 21, 27, the Ohio Supreme Court set forth a three-prong test for finding plain error: (1) there must be an error, i.e., a deviation from a legal rule; (2) the error must be plain, i.e., the error must be an "obvious" defect in the trial proceedings; and (3) the error must have affected *Page 6 
"substantial rights," i.e. the error must have affected the outcome of the trial. In determining whether there has, in fact, been plain error, it is necessary that courts apply the utmost caution, and may find plain error only under exceptional circumstances, and only to prevent a manifest miscarriage of justice. Id. See, also, State v. Hommes, 11th Dist. No. 2005-A-0024, 2006-Ohio-2645, at ¶ 28.
 {¶ 20} Effect of Defective Indictment
 {¶ 21} In Count Four of the indictment, appellant was charged with child endangering, in violation of R.C. 2919.22. The culpable mental state for the offense of child endangering is recklessness. State v.Adams (1980), 62 Ohio St.2d 151, paragraph one of the syllabus;State v. O'Brien (1987), 30 Ohio St.3d 122, paragraph one of the syllabus; State v. McGee (1997), 79 Ohio St.3d 193, 195; State v.Schaffer (1998), 127 Ohio App.3d 501, 503.
 {¶ 22} Both parties concede that Count Four of the indictment failed to contain the required mental state of recklessness, that the bill of particulars was also deficient in specifying this mental state, and that the jury charge was silent as to the element of recklessness.[1] Both parties further concede that neither party sought to amend the indictment under Crim. R. 7(D).
 {¶ 23} In arguing that his conviction must be reversed for lack of subject matter jurisdiction, appellant relies on State v. Conley, 5th Dist. No. 03-CA-18, 2005-Ohio-3257. In Conley, the indictment charging the defendant with child endangering, like the *Page 7 
one here, did not include recklessness. The court held that the indictment was not sufficient to charge an offense; hence, the conviction was void for lack of jurisdiction. Id. at ¶ 21. In reaching this result, the Conley court relied on the decision of State v.Cimpritz (1953), 158 Ohio St. 490, 493, which held that "if any material element or ingredient of the offense, as defined by the statute, is omitted from an indictment, such omission is fatal to the validity of the indictment." Furthermore, if defective, then the conviction is void for lack of subject matter jurisdiction.
 {¶ 24} The inherent flaw with the Conley decision is that its reliance on Cimpritz is misplaced given the subsequent Supreme Court of Ohio decision of Midling v. Perrini (1968), 14 Ohio St.2d 106, 107, which held that the failure to object to a defective indictment is not jurisdictional. The Second District, in State v. Cochran (Dec. 29, 1995), 2nd Dist. No. 94-CA-80, 1995 Ohio App. LEXIS 5809, 6-7, has recognized this distinction. See, also, State v. Castile, 6th Dist. No. E-02-012, 2005-Ohio-133, at ¶ 67. The Cochran court explained the distinction as follows:
 {¶ 25} "Under early case law, the Ohio courts distinguished between objections concerning the failure of the indictment to state an offense and objections relating to the form or substance of the indictment.State v. Cimpritz (1953), 158 Ohio St. 490, 110 N.E.2d 416; State v.Pres/er (1960), 112 Ohio App. 437, 176 N.E.2d 308. Objections pertaining to the form and substance of the indictment were deemed waived if not raised at the trial court. On the contrary, challenges concerning the failure of the indictment to state an offense were not waived because such errors were jurisdictional and stripped the trial court of its subject matter jurisdiction. These objections could be raised on appeal in the form of lack of subject matter jurisdiction, an error that can be *Page 8 
raised at any time. The Supreme Court of Ohio discarded this distinction in Midling. There, the court held the failure to object to an indictment on the grounds that it does not state an offense does not deprive the trial court of subject matter jurisdiction. As a result, a defendant now may not raise either challenge on appeal, unless, he or she first lodged an objection in the trial court. * * * The rationale for this change is to encourage objections to be made early on when they can easily be corrected." Cochran at 6-7.
 {¶ 26} Based on this rationale and because the defendant did not raise an objection of the insufficiency of the indictment at the trial court, the Cochran court found that he waived his objection. The court consequently applied a plain error analysis, and found that, despite the failure of the indictment to allege specific overt acts, as required, the defect did not affect the outcome of the trial; hence, the court rejected the defendant's argument.
 {¶ 27} We find the reasoning of the Cochran decision to be more persuasive than that of State v. Conley, supra. Furthermore, Crim. R. 12 and R.C. 2941.29 dictate that defects in indictments must be raised at the trial court level. Specifically, R.C. 2941.29 states:
 {¶ 28} "No indictment * * * shall be quashed, set aside, or dismissed * * * unless the objection to such indictment * * * specifically stating the defect claimed, is made prior to the commencement of the trial, or at such time thereafter as the court permits."
 {¶ 29} Plain Error Analysis
 {¶ 30} As applied to this case, since appellant failed to raise the objection of the failure of the indictment to contain language as to the mens rea of recklessness, and *Page 9 
since the jury was not instructed on the culpable mental state of recklessness, we apply a plain error analysis.
 {¶ 31} We cannot say that the failure of the indictment to contain the element of recklessness constituted plain error. To begin with, at a minimum, Count Four of the indictment referenced the statute, thus providing appellant with knowledge of the offense he was being charged with. It is well settled that "under Ohio law, a criminal indictment is intended to serve two basic purposes: (1) it compels the state to aver all material elements of the charged offense so that the defendant can have proper notice and a reasonable opportunity to defend himself; and (2) by properly identifying the charged offense, it protects the defendant from future prosecutions for the same crime." State of Ohio,ex rel. Stanley Smith, 11th Dist. No. 2004-A-0080, 2005-Ohio-825, at ¶ 5. Here, since the indictment referred to the statute, appellant was apprised of the charged offense.
 {¶ 32} Moreover, the evidence adduced at trial clearly demonstrates that regardless of the error inherent in the indictment, there was sufficient evidence presented to show that appellant did, in fact, act recklessly and was properly convicted of child endangering.
 {¶ 33} Pursuant to R.C. 2901.22(C), "[a] person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature."
 {¶ 34} In this case, the evidence demonstrated that appellant was entrusted with the care of Jeramie Vitale on November 5, 2004, while his mother, Rachel, was away at work. Although appellant attempted to explain that Jeramie's injuries stemmed from a *Page 10 
fall down five to six carpeted stairs, the medical evidence conclusively proves otherwise. Dr. Alan Cohen, Chief of Pediatric Neurosurgery at RB C, repeatedly testified that the injuries sustained, including a subgaleal hematoma, two blood clots in the brain, bruises to his scrotum, trauma to his eye, were not consistent with a fall down the stairs. Rather, these injuries were indicative of a non-accidental trauma and consistent with child abuse, or "shaken baby syndrome." Dr. Cohen described the injuries that were inflicted on Jeramie as "life-threatening" and thought it was remarkable that he had survived.
 {¶ 35} Other medical professionals reached the same conclusion, that Jeramie's injuries were consistent with shaken baby syndrome. Dr. McDavid also testified that retinal hemorrhages, like the one Jeramie sustained, are distinctive for a shake injury and that little else can cause such an injury. She emphatically testified that the Jeramie's injuries could not have been caused by a fall down the stairs.
 {¶ 36} Not only does the medical evidence demonstrate that Jeramie's injuries were caused by being shaken, but there was also evidence that appellant tried to conceal his injuries and condition from Rachel. According to Rachel's testimony (disputed by appellant), she was not told about Jeramie's fall down the stairs until after she came home from work. Then, when she arrived home, appellant had already put Jeramie to sleep and had allegedly fed him dinner. When Rachel told appellant that she wanted to check on Jeramie and give him juice later that evening, appellant offered to do this for her. In the morning, upon discovering Jeramie's serious condition, appellant tried to prevent Rachel from taking him to the hospital. *Page 11 
 {¶ 37} The overwhelming evidence shows that appellant acted recklessly and caused serious physical injury to Jeramie. We cannot say under these circumstances that, but for the error in the indictment, the outcome of the trial would have been different.
 {¶ 38} Nor can we say there was a manifest injustice in the trial court's failure to instruct the jury on the element of recklessness, inasmuch as the jury was properly instructed as to the requisite culpable mental state required for a violation of the felonious assault statute, "knowingly," which is a higher degree of culpability than "recklessly," and the jury found appellant guilty of felonious assault.
 {¶ 39} Appellant's first assignment of error is overruled.
 {¶ 40} Ineffective Assistance of Counsel Claim
 {¶ 41} In his second assignment of error, appellant contends that he was denied effective assistance of counsel. Specifically, appellant argues that his trial counsel was deficient in (1) failing to object to the defect in Count Four of the indictment and the omission of the culpable mental state of recklessness; and (2) in failing to object to the court's failure to charge on recklessness.
 {¶ 42} In reviewing an ineffective assistance of counsel claim, the benchmark is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington (1984),466 U.S. 668, 686. To successfully assert ineffective assistance of counsel, appellant must show that the attorney made errors so serious that he or she was not functioning as "counsel" as guaranteed by the Sixth Amendment, and appellant must show that he or she was prejudiced by the deficient performance. In other words, *Page 12 
appellant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. We presume that counsel's conduct was competent. Id. See, also, State v.Bradley (1989), 42 Ohio St.3d 136, 143.
 {¶ 43} In order to satisfy the Strickland test, we need not address the first prong (regarding the deficiency of counsel's performance) "[i]f it is easier to dispose of an ineffectiveness claim on the ground of sufficient prejudice * * *." Strickland, at 697; see, also, State v.Peacock, 11th Dist. No. 2002-L-115, 2003-Ohio-6772, at ¶ 12-13.
 {¶ 44} As applied to this case, appellant cannot show that he was prejudiced by trial counsel's actions. As demonstrated in our disposition of the first assignment of error, even if trial counsel had objected to the indictment or jury instructions, he cannot prove that the outcome of the trial would have been any different. In fact, had trial counsel brought the defective indictment to the attention of the trial court, it is highly likely that the state, in being informed of the oversight, would have sought to amend the indictment under Crim. R. 7 and have asked for a charge on recklessness. Under these circumstances, appellant cannot prove prejudice. Appellant's second assignment of error is overruled.
 {¶ 45} Accordingly, the judgment of the Ashtabula County Court of Common Pleas is affirmed.
WILLIAM M. O'NEILL, J., DIANE V. GRENDELL, J., concur.
[1] Count Four of the indictment contained the following language: "On or about the 5th day of November, 2004, in the city of Conneaut, Ashtabula County, Ohio, one ANTHONY BATICH did abuse a 2 ½ year old boy whose date of birth is 4-30-02, and did cause serious physical harm to the child, specifically, a serious head injury. This act, to wit: Child Endangering, constitutes a felony of the second degree, contrary to and in violation of the Ohio Revised Code, Title 29, § 2919.22; and against the peace and dignity of the State of Ohio." *Page 1