[Cite as *State v. Malachin*, 2022-Ohio-4047.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

| | |
|---|---|
| STATE OF OHIO,<br><br>Plaintiff-Appellee,<br><br>- vs -<br><br>ANDREW W. MALACHIN,<br><br>Defendant-Appellant. | CASE NO. 2022-T-0002<br><br>Criminal Appeal from the<br>Court of Common Pleas<br><br>Trial Court No. 2021 CR 00188 |

### O P I N I O N

Decided: November 14, 2022
Judgment: Affirmed

*Dennis Watkins*, Trumbull County Prosecutor, and *Ryan J. Sanders*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*Martin Yavorcik*, 940 Windham Court, Suite 7, Youngstown, OH 44514 (For Defendant-Appellant).

JOHN J. EKLUND, J.

{¶1} Appellant, Andrew Malachin, appeals his sentence from the Trumbull County Court of Common Pleas. Appellant raises four assignments of error arguing: (1) that trial counsel rendered ineffective assistance of counsel; (2) that his conviction is not supported by sufficient evidence; (3) that his conviction is against the manifest weight of the evidence; and (4) that R.C. 2967.271, the Reagan Tokes indefinite sentencing law, is unconstitutional.

{¶2} After review of the record and the applicable caselaw, we find appellant's assignments of error to be without merit. Trial counsel was not ineffective for failing object to the State's theory of the case. Counsel was not ineffective for failing to object to a reworked DNA report which was performed by a new analyst less than 21 days before trial. Next, appellant's conviction was supported by the manifest weight of the evidence and even appellant's own testimony did not preclude the jury from concluding that he raped the victim. Finally, we have previously upheld the constitutionality of the Reagan Tokes Law in *State v. Reffitt*, 11th Dist. Lake Case No. 2021-L-129, 2022-Ohio-3371, and *State v. Joyce,* 11th Dist. Lake Case No. 2021-L-006, 2022-Ohio-3370.

{¶3} Thus, we affirm the judgment of the Trumbull County Court of Common Pleas.

**Substantive and Procedural History**

{¶4} In May 2021, appellant was indicted for two counts of Rape, in violation of R.C. 2907.02(A)(1)(c) (substantial impairment) and (A)(2)(b) (force), both first-degree felonies.

{¶5} Jury trial was set for November 22, 2021. At the final status hearing held on November 4, the State notified the court that their DNA expert would be unavailable for trial because she was on maternity leave. The State said it would provide a reworked DNA report and the name of the substitute witness. On November 5, 17 days before trial, the State provided appellant the reworked DNA report, the name of the expert, and his curriculum vitae. Appellant's trial counsel did not object to the new report, and it appears that the original report and the new report were identical save that they were performed by different experts.

2

{¶6} The case proceeded to jury trial. The State first called the victim, Amber Gadd. She testified that she had grown up in Trumbull County, but that she had moved away when she turned 18 and only recently moved back to the area. She explained that she and her two children had moved in with her aunt, Cheyanne Grove, and uncle, John Grove in Liberty Township, Trumbull County, Ohio.

{¶7} Gadd said that she has known appellant all her life. Gadd, now 37, described her relationship with appellant as "like family to us. He's almost like an uncle." She said that she refers to him as "Pappy Andy" and that he would call her "baby girl" or "princess." She said that appellant would introduce her "like a daughter of mine" to other people.

{¶8} Gadd said that on February 5, 2021, she made a plan to meet appellant at Ice Breakers Pool Hall in Austintown, Ohio. According to Gadd, appellant and his wife, Heidi, go to Ice Breaker's nearly everyday.

{¶9} Gadd arrived at the pool hall around 10:00 pm. She said that she talked with appellant and his wife for approximately one hour before she ordered her first drink, a Tito's and ginger ale. Gadd said that she is not a drinker and that it only takes two or three drinks before she feels intoxicated. After she ordered her first drink, appellant ordered a shot of tequila for everyone in their group.

{¶10} During the evening, Eddie, one of Gadd's friends arrived at the bar. She said that appellant and Heidi were standoffish to Eddie. Appellant asked Gadd if she had ever had a Tito's and cranberry. She said she had not, and that she saw appellant walk behind the bar to make the drink. At the same time, Heidi began insisting that Eddie was

3

"not taking her [Gadd] home." Eddie told Gadd that he did not want to deal with appellant and Heidi's behavior and left the pool hall.

{¶11} While Eddie was leaving, Gadd noticed the drink that appellant had made was in front of her. She said that she drank about half of the drink and started to feel sick. She began to have trouble seeing, started vomiting, and lost control of her bowels. She said that she could no longer stand after that point and was hovering over a trash can by the bar. She said that the last clear memories of the evening were being at the bar and being violently ill.

{¶12} Gadd said that she did not remember how she got home that night. She said that she got a call at 2:00 a.m. on February 6, and she woke up with rectal pain. She was naked and in her bed. Gadd said that she does not sleep naked and always wears a hoodie and sweatpants. She was still unable to see clearly or stand. She said that she attempted to text her daughter "don't let him in your room." However, the text itself was mostly unintelligible. Gadd said that for the next 20 minutes, she was crying, sitting on the floor of her room and unable to get up or open the door to her room. Cheyanne Grove eventually came into her room and then Cheyanne and Gadd's daughter helped to clean her up in the shower. She reported that she continued to have rectal discomfort for two weeks.

{¶13} At 2:59 in the morning, appellant texted Gadd "Sweet heart I did nothing to u or thn kids. I dnt remember the kids name at the bar. See if he got ur card or jst cancel it and u can starts new one. Tell the babies I love thm"

{¶14} In the morning, Gadd went to St. Elizabeth Hospital to receive a sexual assault examination and she then filed a criminal report.

4

Case No. 2022-T-0002

{¶15} The State next called A.V., Gadd's 13-year-old daughter. She said that she knows appellant but has only interacted with him a few times. A.V. said that she was playing video games when Gadd returned to the home around 12:45 a.m. A.V. said that the gaming system was in Gadd's bedroom. She said that appellant brought her mother into the room and that A.V. saw Gadd stumble onto her bed. A.V. described Gadd as "unaware" and that "[s]he has no clue what's going on and he is behind her holding her up by just under her armpit and was just like trying to move her towards the bed." She said that "[i]t's not like she was drunk, she was completely out of it * * * I've never seen her like that ever. * * * I just knew something was wrong, something had happened, but I was not sure what. So I kind of just left it at that thinking okay, she's tired, I'll let her sleep."

{¶16} A.V. said that appellant started to yell at her to get off her gaming system and to go to her bedroom because it was late and her mom was tired and needed time to herself. A.V. told appellant that it was the weekend and that she did not need to get off the gaming system. Appellant then began to scold A.V. because she had left candy wrappers laying around in the room. He picked up the wrappers and shoved them down her shirt. After he did that, A.V. left the room and went to her own room where she was on her phone with headphones in. A.V. said that she thought that appellant had left the house and that her mother was sleeping in the bed.

{¶17} About 15-20 minutes later, appellant came out of Gadd's room and entered A.V.'s room. She said that appellant was not wearing shoes, socks, or a shirt. Appellant told A.V. that her mother was undressing herself, so he left. A.V. told appellant that was a lie because her mom sleeps in a hoodie and sweatpants. Appellant told A.V. that he was going to lay with her and started crawling onto her bed. A.V. began to hear crying

5

coming from her mother's room and then heard a crashing sound. She then received a text message from her mother with jumbled words but that she understood the first line to mean to tell appellant to leave her room. A.V. testified that in that moment she understood that something bad had happened.

{¶18} A.V. recalled that John and Cheyanne Grove woke up and entered her room. They saw appellant in A.V.'s room and her uncle took appellant home. A.V. then helped her aunt get Gadd into the bathroom to clean her up. A.V. said that the water was discolored and a reddish color. Gadd was crying and still unable to stand up. She kept saying he hurt me and asking if he had done anything to A.V. or her sister.

{¶19} The State next called Terry Benetis, a bartender at Ice Breaker's Pool Hall. She testified that she is familiar with appellant and his wife Heidi and that they come to the bar nearly everyday. Benetis also said that appellant has a habit of going behind the bar to make his own drinks. Although he is not allowed to, she said that he continues to do so. She said that she saw him behind the bar that evening but was not sure what he did while there. She said she served Gadd two drinks.

{¶20} Benetis said that she saw Gadd become suddenly sick and that her second drink was still on the bar when she became ill. She said that it was "hard to describe" Gadd's state, noting that it was hard to get her to speak enough just to give them her address. Eventually, Gadd muttered her address while in the bar.

{¶21} Benetis said she was "just out of it like." Benetis said that Gadd's state did not align with someone who had only had two drinks or even three or four. Benetis testified that appellant was not drunk "in any way, shape, or form like that girl was."

6

**{¶22}** The State next called Gadd's uncle, John Grove. He said that around 12:30 - 1:00 a.m. on February 6, his wife woke him up to let Gadd into the house. He said that Gadd never came home drunk and did not make a habit of going out drinking while she stayed with him. Gadd did not look like herself and needed assistance walking. Gadd's daughter was in her room, so he went back to bed.

**{¶23}** Next, John said that his wife woke him up around 2:00 a.m. saying that Gadd was in her room crying and that something was wrong. He said that he forced the door open and saw Gadd curled up in the corner of the room. He said Gadd had difficulty speaking, but that he thought he heard her say "get him out of here." He did not realize appellant was still in the house at this point. He said that appellant was not wearing his shirt, shoes, or socks. John told appellant to gather his things so he could take him home. John did not believe that appellant showed signs of intoxication.

**{¶24}** Gadd's aunt, Cheyanne Grove, testified that she knew Gadd had gone out to meet appellant and his wife. She received a call around 12:30 a.m. from appellant saying that Gadd had had too much to drink and that he would be bringing her home in her car. She did not get out of bed when Gadd arrived, but she woke up hearing banging coming from A.V.'s room and the sound of Gadd crying in her room. Cheyanne went into the children's room and saw appellant on the floor with no shirt, shoes, or socks on. She asked what he was doing in the girls' room. She called her husband to the room and told him to get appellant out of the house.

**{¶25}** Cheyanne then went into Gadd's room and found her on the floor having difficulty talking, crying, and hysterical. Gadd told Cheyanne that appellant had raped her.

7

During the night, Cheyanne used Gadd's phone to call appellant. She called and said, "You f*****, you raped my niece." Appellant did not respond when he heard this.

{¶26} The State called Officer Ashley Kitchen of the Liberty Police Department. She was called to St. Elizabeth Hospital in Boardman to take Gadd's sexual assault report. Kitchen described Gadd's demeanor as teary-eyed and her appearance as disheveled. She said that Gadd appeared to be in physical discomfort. Gadd gave an oral and written statement.

{¶27} The State next called Liberty Police Department Detective Michael Shuster. Shuster investigated Gadd's report of sexual assault and in the course of that investigation he gathered evidence including two socks from Gadd's bedroom and a chewing tobacco can that did not belong there.

{¶28} On February 8, Shushter interviewed appellant at the Liberty Police Department. During the interview, he observed that appellant chews tobacco. Appellant told Shushter that he had no reason to believe that his DNA would be found in the rape test kit performed on Gadd. During the interview, appellant denied the rape and expressed a clear and articulate recollection from the night. His statement to Shushter did not indicate any gaps or lapses in memory and did not indicate that he blacked out at any point. Appellant consented to give a DNA sample to Shushter. Shushter sent the socks and appellant's DNA sample to the Ohio Bureau of Criminal Investigation (BCI) for analysis.

{¶29} Collen Monahan was the registered nurse who conducted Gadd's Sexual Assault Nursing Exam (SANE). She explained the process used to complete the paperwork and to conduct an examination including the rape kits that are used to collect

8

DNA samples. Monahan collected vaginal, anal, and cheek swabs from Gadd. Monahan's completed report indicated that Gadd complained of rectal tenderness, but that there was no visual sign of tenderness. Monahan said that it is actually rare to observe physical signs of trauma. She agreed that bleeding could indicate internal trauma.

{¶30} Registered Nurse Barbara Turner also testified that she reviewed the SANE report that Monahan conducted for purposes of her testimony. However, Turner did not treat Gadd. She testified that she is a SANE certified nurse and that she had performed over 500 SANE reports. She discussed drug-facilitated sexual assault, which involves a person being under the influence of drugs or alcohol and that in those cases, it is less likely to see signs of physical trauma because the person's body is in a relaxed state, especially if they have passed out. She reported that studies of anal rape in reported drug-facilitated sexual assault indicate only six percent of patients had anal trauma.

{¶31} Turner indicated that due to COVID-19, certain routine SANE practices had been discontinued and that ER staff were given a four-hour training course to fill in the gap for the full SANE program. She said that some aspects of the SANE program suffered as a result. One specific issue she highlighted was that no one collected Gadd's urine or blood to provide to law enforcement to perform a toxicology analysis.

{¶32} The State's final witness was David Miller, the forensic scientist with BCI. Miller performed the DNA analysis of the evidence in this case. His report indicated that he analyzed two vaginal samples, two anal samples, and two oral samples from Gadd's rape kit. He analyzed a DNA standard for comparison purposes and a DNA standard obtained from appellant. Finally, he analyzed two swabs taken from the socks found in Gadd's bedroom.

9

**{¶33}** Miller said that his test determined that Gadd's vaginal and anal samples were positive for acid phosphate activity. Acid phosphate activity is a presumptive test for the presence of semen in a sample. He said that it is not confirmatory but is a quick screening test. If the test is positive, there is a good likelihood that it is due to the presence of semen in the sample. Once a presumptive positive has been confirmed, further testing is done.

**{¶34}** Based on the presumptive positive result, Miller conducted further testing called a differential extraction. That additional testing separates out the sperm cells from the non-sperm cells to provide a "sperm fraction" DNA sample. Miller said that Gadd's vaginal and anal samples showed two distinct contributors of DNA – Gadd herself and appellant. Miller said that the presence of DNA consistent with appellant's sample in the sperm fraction test does not "confirm" that appellant's sperm was present. However, he said the sperm fraction test and the presumptive acid phosphate test both being positive make it "difficult for me to come up with a reasonable alternative to that being the case seeing as the DNA profile that was consistent with Andrew Malachin was in that sperm fraction that I mentioned before."

**{¶35}** In addition, Miller tested the swab for the socks found in Gadd's bedroom and the DNA profile for the samples was consistent with appellant.

**{¶36}** The State rested its case and appellant called his wife, Heidi Malachin to testify. Heidi said that on February 5, Gadd met her and appellant at the pool hall. Heidi said that the group was drinking and having conversation. Heidi recalled that she, appellant, and Gadd had four double shots and shared a bucket of beer. She denied seeing appellant prepare a drink for Gadd but did say that appellant poured shots for the

10

group. Heidi said that all three became intoxicated while they were drinking. Heidi said that after Gadd became sick, the group was in the bar for about an hour after it stopped serving alcohol because they were trying to get Gadd "settled." She believed that Gadd's behavior was consistent with intoxication. She denied that Gadd was unable to talk or barely conscious at the time she left the bar.

{¶37} She said that after appellant took Gadd home, he texted her around 1:15 a.m. to say he would be staying the night so that Heidi did not have to drive to pick him up. However, she said that Gadd's uncle brought appellant home around 3:00 a.m.

{¶38} According to Heidi, appellant did not remember anything from that night besides arriving at the house, putting Gadd into the bed, taking his shoes off, and passing out. Heidi admitted that on a recorded jail phone call she told appellant that "maybe this will teach you to appreciate what you have at home." She also agreed that some sex had to have taken place for appellant's semen to be in Gadd's vagina and anus.

{¶39} Finally, appellant testified on his own behalf. He said that he was at the pool hall all day, but that he was practicing pool and did not start drinking until about 6:00 pm. Appellant said that once Gadd arrived at the pool hall, she ordered a mixed drink for herself and shots for herself, Heidi, and appellant. Appellant explained that the pool hall serves double shots. In total, appellant said that Gadd had two mixed drinks and four double shots.

{¶40} Appellant recounted Gadd's friend Eddie coming up to them and that Gadd was already intoxicated. Eddie offered to take Gadd home and appellant said, "that wasn't going to happen for the fact that she was as drunk as she was and I didn't know this guy."

11

**{¶41}** He said that Gadd became sick and was throwing up, needed help in the bathroom, and was stumbling. He said that Gadd mumbled her address, which he used to get her home. Appellant said that he was "pretty buzzed up" by this point of the night.

**{¶42}** Appellant recalled taking Gadd into the house and that she was stumbling and would not have made it in the house without his assistance. He said that her uncle and aunt were sitting in the kitchen. They directed him to the bedroom where he rolled Gadd into bed, put a cover over her, "and that was it." He said he remembers sitting on the floor and taking his shoes off. Appellant testified that he then passed out.

**{¶43}** He next remembers waking up, leaving Gadd's room and talking to AV in her room. After that, Gadd's uncle came and took him home. He said that he did not remember too much of the trip home.

**{¶44}** Appellant addressed his statement to the police that it would be "impossible" that his DNA would be at the scene. He said that he has no clue how his DNA was found and that he was passed out. When asked if he had sex with Gadd, he said that he did not recall. When pressed with the information that his sperm was found in Gadd's vagina and anus, appellant said that "I would have to have" had sex with Gadd. When asked to admit what he did to Gadd, appellant said "I don't recall." He agreed that Gadd was heavily intoxicated and had a present reduction of her abilities that continued for the remainder of the evening. When asked if it was possible that he raped Gadd while she was unconscious, he said that "[a]nything is possible."

**{¶45}** In closing arguments, the State presented a theory that appellant had drugged Gadd's drink, which caused her to black out. Appellant's counsel countered this with information from trial indicating that Gadd herself reached out to appellant to meet

12

up and that the meeting was unplanned. Counsel argued that it would be highly unlikely that appellant would have planned to drug Gadd. Appellant's counsel also noted that the State did not provide any evidence that would prove that appellant drugged Gadd, such as a toxicology report.

{¶46} After deliberation, the jury returned a guilty verdict for both counts. The two rape counts merged for purposes of sentencing and the State elected to proceed on Count 1, in violation of R.C. 2907.02(A)(1)(c).

{¶47} Appellant timely appealed asserting four assignments of error.

## Assignments of Error and Analysis

{¶48} Appellant's first assignment of error states:

{¶49} "[1.] The trial court erred in allowing a conviction despite ineffective assistance of trial counsel."

{¶50} Appellant argues that his trial counsel was ineffective because counsel failed to object when the State sought to substitute its DNA expert and report less than 21 days before trial. Appellant also argues that counsel was ineffective for conceding that appellant's semen was present in Gadd's vagina and anus and not thoroughly cross-examining the State's DNA expert. Finally, appellant argues that trial counsel was ineffective for failing to file a motion in limine and failing to object to the State's theory that appellant somehow drugged Gadd's drink to perpetrate a drug-facilitated sexual assault.

{¶51} In reviewing an ineffective assistance of counsel claim, the standard we apply is "'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *State v. Story*, 11th Dist. Ashtabula No. 2006-A-0085, 2007-Ohio-4959, ¶ 49, quoting

13

*Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). An appellant must demonstrate (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability, were it not for counsel's errors, the result of the proceedings would have been different. *Strickland* at 669. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. A failure to "satisfy one prong of the Strickland test negates a court's need to consider the other." *State v. Madrigal*, 87 Ohio St.3d 378, 389, 2000-Ohio-448, 721 N.E.2d 52, citing *Strickland* at 697.

{¶52} An appellant must be able to demonstrate that "the attorney made errors so serious that he or she was not functioning as 'counsel' as guaranteed by the Sixth Amendment," and that he was prejudiced by the deficient performance. *Story, supra*, 2007-Ohio-4959, ¶ 49, quoting *State v. Batich*, 11th Dist. Ashtabula No. 2006-A-0031, 2007-Ohio-2305, ¶ 42. Ohio courts presume that every properly licensed attorney is competent, and therefore a defendant bears the burden of proof. *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). "Debatable trial tactics generally do not constitute a deprivation of effective counsel." *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995). "Failure to do a futile act cannot be the basis for claims of ineffective assistance of counsel, nor could such a failure be prejudicial." *State v. Henderson*, 8th Dist. Cuyahoga No. 88185, 2007–Ohio–2372, at ¶ 42.

14

Case No. 2022-T-0002

**Crim.R. 16(K):**

{¶53} Appellant argues that his trial counsel was ineffective for failing to object to the reworked expert report after the State notified the trial court and appellant that the DNA expert they it intended to call would be on maternity leave during the trial. Appellant states that Crim.R. 16(K) requires that expert witnesses and reports must be provided at least 21 days prior to trial. In this instance, the State provided the name of the new expert and his report only 17 days prior to trail. Appellant therefore believes it was error for trial counsel not to object to the admission of the expert report and expert testimony. He further states that the DNA testimony was severely injurious to his case and was the only definitive evidence that appellant had sex with Gadd.

{¶54} Crim.R. 16(K) provides:

**Expert Witnesses; Reports.** An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶55} Significantly, appellant does not address the language of the rule that provides that the 21 day "period may be modified by the court for good cause shown, which does not prejudice any other party." The State's reworked DNA report is nearly identical to the original report. The new report states that it "replaces the original reports * * *." Further, the State's DNA witness, David Miller testified that laboratory reports are reviewed by a second analyst to confirm the findings. Miller stated that he reviewed the

15

Case No. 2022-T-0002

prior report when it was issued and conducted an entirely new analysis when he was called to testify.

{¶56} The State showed good cause for why it submitted a new report an expert witness less than 21 days before trial because its witness was unavailable. Next, the replacement report was virtually identical to the prior report. Therefore, the change did not prejudice appellant. We are to presume that trial counsel is competent and trial counsel's lack of objection to the new report and witness demonstrates the lack of prejudice rather than ineffective assistance of counsel. *See State v. Smith*, 17 Ohio St.3d at 100.

**Cross-examination of DNA Expert:**

{¶57} Appellant also believes trial counsel was ineffective because he did not conduct a stronger cross-examination of Miller. Particularly, appellant believes that trial counsel should have attacked Miller's testimony that he could not "actually confirm" the presence of appellant's semen in Gadd's vagina and anus.

{¶58} Although discussed in more detail below relative to the sufficiency and manifest weight of the evidence, appellant appears to mischaracterize Miller's testimony. Miler testified that he conducted a preliminary confirmatory test to determine whether semen was present in the tested samples. After that test, Miller conducted a differential extraction to obtain a sperm fraction sample. Miller then tested that sample and found DNA consistent with appellant's DNA profile in the sperm fraction sample. Miller did not find any unknown or unexpected sources of DNA in that sperm fraction sample. Although Miller did not "confirm" that appellant's sperm was present in the sperm fraction sample, he did say that it would be "difficult for me to come up with a

16

reasonable alternative to that being the case seeing as the DNA profile that was consistent with Andrew Malachin was in that sperm fraction that I mentioned before."

{¶59} "'The scope of cross-examination falls within the ambit of trial strategy * * *.'" *State v. Rogers*, 11th Dist. Lake No. 2018-L-119, 2019-Ohio-4834, ¶ 40, quoting *State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101. "Debatable trial tactics generally do not constitute a deprivation of effective counsel." *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995). We will not second guess trial counsel's strategic cross-examination questions, particularly as Miller's testimony thoroughly detailed his analysis.

**Objection/Motion in limine to State's Theory of the Case:**

{¶60} Appellant argues that the State's drug-facilitated sexual assault theory of the case was not supported by the record. Appellant is correct that the State did not present specific evidence that appellant drugged Gadd or toxicology reports that would indicate the presence of drugs in Gadd's system.

{¶61} The State called Registered Nurse Barbara Turner who discussed drug-facilitated sexual assaults. Appellant suggests that this testimony should have been qualified as expert testimony and argued that Turner did not treat Gadd and that there was no toxicology to support a theory of drug-facilitated sexual assault.

{¶62} However, Turner did not specifically allege that appellant drugged Gadd. Turner testified as to her experience with SANE procedures and explained that the term drug-facilitated sexual assault refers to individuals who are under the influence of drugs or alcohol. The term does not necessarily mean that a perpetrator has administered drugs

17

Case No. 2022-T-0002

or alcohol to a victim. Instead, it broadly indicates that drugs or alcohol incapacitate a person who is then subjected to a sexual assault.

{¶63} The State openly acknowledged that it had no direct proof that appellant did anything specifically to Gadd's drink to incapacitate her. However, there was circumstantial evidence that warranted the State's theory. Gadd testified that appellant told her he would make her a drink and that she quickly fell violently ill and blacked out after consuming only half of the drink he said he would make for her. Other witnesses, including Benetis and AV indicated that she did not seem to be merely intoxicated and both used the phrase "out of it" to describe her condition. Indeed, appellant himself agreed that Gadd had a present reduction of her abilities that continued during the night.

{¶64} Further, Benetis testified that appellant had a habit of making his own drinks, despite her telling him on prior occasions not to do so. She further testified that she saw him making drinks that day, although she denied seeing him prepare the specific drink in question.

{¶65} The State's drug-facilitated sexual assault theory of the case certainly had support and an objection to the introduction of that theory would not likely have been successful. Trial counsel addressed the logic of the State's drug-facilitated sexual assault theory during closing arguments rather than through an objection to the theory per se. In doing so, trial counsel allowed the State to present a theory of the case that appellant could counter as being illogical and therefore untrue. This amounts to a tactical decision, and we will not second guess that approach.

{¶66} Accordingly, appellant's first assignment of error is without merit.

{¶67} Appellant's second and third assignments of error state:

Case No. 2022-T-0002

**{¶68}** "[2.] The trial court erred in allowing a conviction where it was not supported by sufficient evidence."

**{¶69}** "[3.] The trial court erred in entering judgment on the verdict against the manifest weight of the evidence."

**{¶70}** Appellant asserts that his conviction was not supported by sufficient evidence and that it was against the manifest weight of the evidence. In support of this, he argues that the State's DNA expert could not confirm the presence of sperm in the tested samples, that Gadd was unable to recall the rape, that Gadd suffered no physical injury, that the State did not prove that Gadd's drink was drugged or that appellant drugged it, appellant testified that he did not remember having sex with Gadd, and that no witness witnessed or heard any sexual encounter at all.

**Sufficiency of the Evidence:**

**{¶71}** "'Sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St. 3d 380, 386, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary (6 Ed.1990) 1433; See also Crim.R. 29(A). The appellate court's standard of review for sufficiency of evidence is to determine, after viewing the evidence in a light most favorable to the prosecution, whether a rational trier of fact could find the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶72}** When evaluating the sufficiency of the evidence, we do not consider its credibility or effect in inducing belief. *Thompkins* at 387. Rather, we decide whether, if

19

Case No. 2022-T-0002

believed, the evidence can sustain the verdict as a matter of law. *Id.* This naturally entails a review of the elements of the charged offense and a review of the State's evidence. *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13.

**Manifest Weight of the Evidence:**

{¶73} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." *Thompkins,* 78 Ohio St. 3d at 389. Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them." (Emphasis sic.) *Id.* at 386, quoting Black's Law Dictionary 1594 (6th Ed.1990).

{¶74} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.*

{¶75} The reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence

20

weighs heavily against the conviction." *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶76} The trier of fact is the sole judge of the weight of the evidence and the credibility of the witnesses. *State v. Landingham*, 11th Dist. Lake No. 2020-L-103, 2021-Ohio-4258, ¶ 22, quoting *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). The trier of fact may believe or disbelieve any witness in whole or in part, considering the demeanor of the witness and the manner in which a witness testifies, the interest, if any of the outcome of the case and the connection with the prosecution or the defendant. *Id.,* quoting *Antil* at 67. This court, engaging in the limited weighing of the evidence introduced at trial, must defer to the weight and factual findings made by the jury. *State v. Brown*, 11th Dist. Trumbull No. 2002-T-0077, 2003-Ohio-7183, ¶ 52, citing *Thompkins* at 390 and *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph two of the syllabus.

{¶77} A finding that a judgment is supported by the manifest weight of the evidence necessarily means the judgment is supported by sufficient evidence. *State v. Arcaro*, 11th Dist. Ashtabula No. 2012-A-0028, 2013-Ohio-1842, ¶ 32.

{¶78} In this case, appellant was convicted of Rape in violation of R.C. 2907.02(A)(1)(c) which provides that:

> No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
>
> * * *
>
> (c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is

21

substantially impaired because of a mental or physical condition or because of advanced age.

R.C. 2907.01(A) defines "sexual conduct" as:

vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

**{¶79}** We must therefore determine whether the jury lost its way and created a manifest miscarriage of justice in finding appellant guilty of Rape under R.C. 2907.02. To do so, we will address each of appellant's arguments in turn.

**DNA Evidence:**

**{¶80}** The State presented evidence through Miller, its DNA expert, that appellant's DNA was present in the rape kit samples. Miller's testimony did not "confirm" that appellant's sperm was present in Gadd's vaginal or anal samples. However, Miller stated that he conducted a presumptive test which indicated the presence of semen in the tested samples. Miller said that after conducting the presumptive test, that he completed a differential extraction which separates sperm cells from the sample. He tested that "sperm fraction" sample and concluded that appellant's DNA was present in the sample. Although Miller could not "confirm" that appellant's sperm was present, he said that it would be difficult to think of any other possible explanation.

**{¶81}** Further, Miller did confirm that appellant's DNA was present in both the anal and vaginal samples. Importantly, ejaculation is not necessary to complete the crime of rape. It hardly matters whether appellant's sperm was present when his DNA was found in the vaginal and anal samples because that alone demonstrates that appellant engaged

22

in vaginal and anal sexual intercourse with Gadd. This alone is demonstrative that appellant engaged in sexual conduct with Gadd.

**Gadd's Lack of Memory and Gadd's Lack of Physical Injury:**

{¶82} Next, appellant argues that Gadd's lack of memory and lack of physical trauma precludes finding that she was sexually assaulted. Despite Gadd's lack of memory, the State presented significant circumstantial evidence that appellant engaged in sexual conduct with Gadd while she was unconscious. Such evidence included appellant not wearing a shirt as he left Gadd's room and Gadd's physical discomfort when she woke. Further, the State presented direct evidence of sexual conduct because a DNA profile consistent with appellant was present in the samples recovered from Gadd. Gadd's lack of memory demonstrated her inability to resist or consent. Multiple witnesses attested to her diminished state. That diminished state, coupled with the DNA profile consistent with appellant's in the vaginal and anal samples, is strong evidence that appellant engaged in sexual conduct with Gadd when he had reasonable cause to believe that she could not resist or consent.

{¶83} As to physical injury, the State presented evidence from registered nurse Barbara Turner that physical injury is uncommon in cases of drug-facilitated sexual assault. Gadd testified that she woke up with rectal pain and other witnesses noted that she appeared uncomfortable lying on her back. A.V. noticed red discoloration in the water when showering Gadd. While Gadd's sexual assault examination did not indicate any visible physical injury, the report did note that Gadd was complaining of rectal tenderness. In light of the other evidence in this case, the lack of physical injury does not demonstrate a lack of evidence of sexual assault.

23

**Drug-Facilitated Sexual Assault:**

{¶84} The State presented a case dependent on drug-facilitated sexual assault. However, appellant's argument is that the State did not put forth evidence to support this theory. Although the State suggested that appellant may have drugged Gadd's drink, the State's theory of the case did not necessarily depend on proof that appellant drugged Gadd or that Gadd had drugs in her system. Instead, the State presented clear evidence that Gadd's ability to resist or consent had been substantially impaired because of her physical condition. The Ohio Supreme Court has held that a "condition" under R.C. 2907.02(A)(1)(C) is "something that affects the victim independently" and need not be a condition caused by the accused. *State v. Horn*, 159 Ohio St.3d 539, 2020-Ohio-960, 152 N.E.3d 241, ¶ 10.

{¶85} Whether as the result of alcohol consumption or an illicit drug placed in her drink, Gadd testified that she remembers very little after she drank half of the drink appellant prepared for her. She said that she became violently ill, vomited, defecated, and lost the ability to stand. Other witnesses confirmed this. A.V. and Benetis both described Gadd's condition as being "out of it" and Benetis did not believe Gadd's condition was consistent with the number of drinks Gadd had consumed. Benetis said that Gadd could barely communicate. Multiple witnesses, including appellant, indicated that Gadd had trouble standing or walking. Heidi testified that Gadd's level of drunkenness was a "nine" on a scale of "ten", but she was unable to describe what additional factors would constitute a "ten."

{¶86} Further, appellant himself acknowledged that Gadd's ability to consent or resist had been substantially impaired and that impairment continued throughout the

24

night. Therefore, appellant had reasonable cause to believe that Gadd's ability to resist or consent was substantially impaired. Whether that impairment was the result of alcohol or drugs, appellant knew that Gadd's physical condition rendered her unable to resist or consent.

**Appellant's lack of memory:**

{¶87} Appellant's testimony at trial was that after he brought Gadd into her room, he passed out on the floor. Appellant claimed that he could not remember having sex with Gadd. He was unable to deny that he raped Gadd and said that "[a]nything is possible."

{¶88} However, during his recorded interview, appellant had a clear and articulate recollection from the night. His recorded statement to Detective Shuster did not indicate any gaps or lapses in memory and he did not say that he blacked out at any point.

{¶89} It is compelling evidence that appellant's testimony was so vague and that he insisted that he could not recall having sex with Gadd when he previously had seemingly clear recollection.

**Lack of Witnesses to sexual encounter:**

{¶90} Although no witness could testify that a sexual encounter took place much less that appellant sexually assaulted Gadd, this lack of witness testimony does not render appellant's conviction against the manifest weight of the evidence. John and Cheyanne Grove testified that they saw appellant in the house without a shirt, shoes, or socks on. A.V. said that appellant was in Gadd's room for 15-20 minutes and that he came out without a shirt, shoes, or socks. Gadd testified that she woke up with rectal pain and other witnesses noted that she appeared uncomfortable lying on her back. A.V. noticed red discoloration in the water when showering Gadd. Finally, as discussed above,

25

the DNA consistent with appellant's profile was evidence that he engaged in sexual conduct with Gadd.

{¶91} In viewing the evidence in a light most favorable to the State, there was sufficient evidence to convict appellant of engaging in sexual conduct with Gadd when appellant had reasonable cause to believe that Gadd's ability to resist was substantially impaired because of a then existing physical condition. Further, the greater amount of credible evidence supports appellant's conviction. The State was entitled to its verdict. This is not the exceptional case in which the evidence weighs heavily against conviction.

{¶92} Accordingly, appellant's second and third assignments of error are without merit.

{¶93} Appellant's fourth assignment of error states:

{¶94} "[4.] As amended by the Reagan Tokes Act, the Revised Code's sentences for qualifying felonies violates the constitutions of the United State and the State of Ohio."

{¶95} In this assignment of error, appellant challenges the constitutionality of R.C. 2967.271, the Reagan Tokes Law. Based on this District's recent holdings in *State v. Reffitt*, 11th Dist. Lake Case No. 2021-L-129, 2022-Ohio-3371, and *State v. Joyce,* 11th Dist. Lake Case No. 2021-L-006, 2022-Ohio-3370, the challenges that appellant advances against the constitutionality of the Reagan Tokes Law have previously been overruled. Appellant does not advance any novel argument left unaddressed by our prior decisions.

{¶96} Pursuant to the above authorities, appellant's challenges to the constitutionality of the Reagan Tokes Law are overruled.

{¶97} Accordingly, appellant's fourth assignment of error is without merit.

26

{¶98} For the foregoing reasons, the judgment of the Trumbull County Court of Common Pleas is affirmed.


THOMAS R. WRIGHT, P.J.,

MARY JANE TRAPP, J.,

concur.

27