[Cite as *State v. Arcaro*, 2013-Ohio-1842.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2012-A-0028** |
| CHESTER A. ARCARO, III, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Ashtabula County Court of Common Pleas, Case No. 2011 CR 499.

Judgment: Affirmed.

*Thomas L. Sartini,* Ashtabula County Prosecutor, and *Shelley M. Pratt,* Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Michael A. Hiener*, P.O. Box 1, Jefferson, OH 44047 (For Defendant-Appellant).

DIANE V. GRENDELL, J.

{¶1} Defendant-appellant, Chester A. Arcaro, III, appeals his conviction, following a jury trial in the Ashtabula County Court of Common Pleas, for Illegal Manufacture of Methamphetamine. The issues to be determined by this court are whether trial counsel is ineffective when he elicits testimony detrimental to the defendant during cross-examination of a witness and whether a conviction for Illegal Manufacture of Methamphetamine is supported by the evidence when a witness who was using drugs and who gave testimony in exchange for leniency was the only witness

who testified to seeing the defendant manufacturing the methamphetamine. For the following reasons, we affirm the judgment of the trial court.

{¶2} On December 15, 2011, the Ashtabula County Grand Jury indicted Arcaro on one count of Illegal Manufacture of Methamphetamine, a felony of the second degree, in violation of R.C. 2925.04(A) and (C)(3)(a).

{¶3} A jury trial was held in this matter on June 5-8, 2012. The following pertinent testimony and evidence was presented.

{¶4} Conneaut Patrolman Timothy Rose testified regarding the events that occurred on October 22, 2011, leading to the present charge against Arcaro. At approximately 2:00 a.m., he noticed a vehicle, containing a female driver and a male passenger making "suspicious maneuvers." After the driver failed to use a turn signal, Patrolman Rose initiated a traffic stop. Shianne Schaffer was the driver of the car. Soon after the stop ended, Patrolman Rose observed Schaffer's car at Fuller Apartments in Conneaut, Ohio. It was parked in front of Apartment 8, which was known to be occupied by Marissa Marcy. Patrolman Rose suspected drug activity in that apartment from prior interactions, and decided to conduct surveillance.

{¶5} While watching the apartment, Patrolman Rose noticed two males carrying plastic grocery bags exit the apartment, one wearing all camouflage and the other wearing a dark hoodie and shorts. After awhile, the two men returned to the apartment without the bags. The two men exited again, and returned a short period of time later. Patrolman Rose subsequently saw them exit a third time, carrying two white garbage bags. The men threw both bags in the dumpster. Patrolman Rose removed the bags from the dumpster and took them to the police station. Upon removing items

2

from the bags, he believed several of the items were consistent with those used in the production of methamphetamine. In the first bag were a box of CVS Cold Relief tablets, which contain pseudoephedrine, several pieces of plastic bag tied into small knots, a cold compress that was torn open, empty syringes, and small pieces of cut drinking straws. In the second bag, there were filtration masks, another box of pseudoephedrine, coffee filters, an acorn shaped "plastic novelty container," lithium batteries that had been torn open, and soaked paper towels with a chemical odor, which Patrolman Rose believed to be methamphetamine.

{¶6} While at the station, Patrolman Rose received notification that a traffic stop had been conducted by Patrolman Brian Distelrath, who had also been conducting surveillance of the apartment. Patrolman Rose went to the site of the stop, where Schaffer was again the driver. Also inside of the car were Arcaro, Billy Googe, and Brandon Haley. Patrolman Rose identified Arcaro as being one of the men he had seen at the apartment throwing away trash bags, and explained that he recognized him because he was wearing the same clothing. Arcaro had in his possession an acorn-shaped container, similar to the one found in the garbage bags, that had a chemical odor inside, as well as a walkie talkie. Patrolman Rose had his dog conduct an "open-air sniff" outside of the car, and it alerted at the rear passenger door, where Arcaro was sitting. Located inside of the car were a digital scale, syringes, coffee filters, plastic baggies, a vial with methamphetamine, and a "shopping list" containing methamphetamine manufacturing ingredients. Under the hood of the car, a plastic key holder wrapped with blue tape was found, containing methamphetamine, which was still wet.

{¶7}    A subsequent search of Marcy's apartment revealed a meth lab, which included a green soda bottle containing a white substance.  A backpack inside the apartment also contained butane and a funnel.  Various paraphernalia, including pipes and cut straws, were found in the apartment.  A camouflage jacket with a walkie talkie, identical to the one carried by Arcaro, was also found.

{¶8}    Conneaut Patrolman Brian Distelrath was called to assist Patrolman Rose on the surveillance of Marcy's apartment on October 22.  He also witnessed the two men exiting the apartment and throwing away the garbage bags.  He remained at the apartment after Patrolman Rose left.  He later saw one female and three males exit the apartment and get into Schaffer's car.  Before entering, one male placed something under the hood of the car.  Patrolman Distelrath followed the car and initiated a traffic stop.

{¶9}    Conneaut Patrolman Denny Moore, a certified methamphetamine lab technician, testified regarding his experience and training in the area of methamphetamine.  He explained the process for manufacturing methamphetamine and noted the process often involves more than one person, due to the steps that must be taken.  He explained that many of the items found in the garbage bags retrieved by Patrolman Rose were consistent with those used to make methamphetamine, including the lithium batteries, the opened ice packs, and the coffee filters.  He testified that the methamphetamine found in the hood of the car appeared to be "freshly made."

{¶10}  Upon conducting a search of Marcy's apartment, Patrolman Moore noted the smell of methamphetamine inside and saw a meth lab.  This consisted of a soda bottle with pseudoephedrine and lithium inside.  There was also a gas generator, which

4

was still emitting gas at the time of the search. He explained various other items used for making methamphetamine were found in the apartment. No fingerprint analysis was done on the various items and there was nothing to directly show the items belonged to Arcaro.

{¶11} Marissa Marcy, Arcaro's friend and a resident of the apartment where the meth lab was found, testified regarding the events surrounding the night of October 22. On the prior day, she purchased pseudoephedrine and gave it to Arcaro. She testified that he was going to use it to make meth, and she was going to receive some in exchange for the pseudoephedrine. She explained that Arcaro brought Googe over to her apartment to make drugs on October 22 and that they were in her apartment "cooking meth" when she returned from a bar. She saw Arcaro shaking the bottle used to make the meth and also saw him "smoking it," or releasing smoke from it in the process of cooking. She asked Arcaro and Googe to leave and they took with them some of the items used to make the meth. Arcaro told Marcy that he had brought the items used to make the meth with him. She saw Arcaro use a scale to weigh out methamphetamine, she purchased some, and Arcaro took some with him when leaving the apartment.

{¶12} On cross-examination, Marcy admitted that she was under the influence of methamphetamine on October 22. She also explained that in her initial statement to police, she said that "Billy [Googe] was the only person I observed cooking meth" and testified that this had been an untrue statement. She also admitted that she made an untrue statement to police when she stated that items used to manufacture meth found in her apartment were Googe's, since they also belonged to Arcaro. She later

5

explained that she initially did not talk to police about Arcaro's involvement because he was her friend and she did not want to get him in trouble. She explained that the methamphetamine she had taken on that date had clouded her judgment and perception.

{¶13} Marcy also admitted that she pled guilty to charges related to this case and that the prosecutor's recommendation for her sentence was conditioned upon her testifying against Arcaro. She did state, however, that she was testifying against Arcaro because "it was the right thing to do."

{¶14} At the conclusion of the State's case, the defense called Patrolman Rose as a witness. He confirmed that during the interview, Marcy stated that Googe was the one cooking meth. He explained that she was not cooperative in providing information about Arcaro at that time.

{¶15} On June 8, 2012, the jury found Arcaro guilty of Illegal Manufacture of Methamphetamine, a felony of the second degree. This verdict was memorialized in the trial court's June 11, 2012 Judgment Entry.

{¶16} Following a sentencing hearing on June 22, 2012, a Judgment Entry of Sentence was issued by the trial court. Arcaro was ordered to serve a term of six years of imprisonment and to pay court costs.

{¶17} Arcaro timely appeals and raises the following assignments of error:

{¶18} "[1.] Appellant's trial attorney provided ineffective assistance of counsel.

{¶19} "[2.] The verdict is against the manifest weight of the evidence and the sufficiency of the evidence."

**{¶20}** In his first assignment of error, Arcaro asserts that his trial counsel was ineffective because he elicited damaging testimony from Marcy during cross-examination, allowed her to repeat such information, and "spent more time eliciting damaging testimony against Appellant than the prosecutor did." He provides as an example that counsel asked where the items used for the manufacture of the methamphetamine came from, and she responded that Arcaro said he brought them. Also, defense counsel asked if Marcy heard a conversation regarding methamphetamines being made in her apartment, and she responded that defendant was selling meth inside of the apartment.

**{¶21}** The State argues that trial counsel was not ineffective in his cross-examination, since he made a valid effort at trying to discredit Marcy's testimony and exposed numerous lies she told to police.

**{¶22}** The Ohio Supreme Court has adopted a two-part test to decide whether an attorney's performance is below the constitutional standard for effective assistance of counsel. To reverse a conviction due to ineffective assistance of counsel, the defendant must prove "(1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52 (2000), citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's performance was reasonable considering all the circumstances. * * * Judicial scrutiny of counsel's performance must be highly deferential." *Strickland* at 688-689.

7

"There is a strong presumption that the attorney's performance was reasonable." *State v. Gotel*, 11th Dist. No. 2006-L-015, 2007-Ohio-888, ¶ 10.

{¶23} In the present matter, while some damaging information was elicited during defense counsel's cross-examination of Marcy, we cannot say that this constituted ineffective assistance of counsel. "The scope of cross-examination clearly falls within the ambit of trial strategy." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45; *State v. Erich*, 11th Dist. No. 2011-L-146, 2012-Ohio-4006, ¶ 23. "[D]ebatable trial tactics do not establish ineffective assistance of counsel." (Citation omitted.) *State v. Johnson*, 11th Dist. No. 2009-A-0050, 2010-Ohio-3046, ¶ 37.

{¶24} In the present matter, defense counsel's strategy included an attempt to discredit Marcy and show that she had both lied to the police about the events of October 22 and that she was not a reliable witness. Much of the information about which Arcaro complains was elicited while defense counsel was attempting to carry out this strategy. For example, before Marcy's statement regarding Arcaro bringing certain chemicals into her apartment, counsel first asked "you have no personal knowledge about whose chemicals they were?" to try to show that Marcy's testimony was of limited value and that she was unaware of exactly who was manufacturing the methamphetamine. Similarly, regarding the second statement that Arcaro was selling drugs in the apartment, this line of questioning began with defense counsel asserting that Marcy's statement about purchasing drugs from Arcaro was inconsistent with her statements to police. Regardless of whether the strategy of asking such questions was ultimately entirely beneficial to Arcaro, the strategy did not render the assistance of

8

counsel ineffective, especially given that the damaging statements resulted from lines of questioning that were intended to elicit information reflecting negatively upon Marcy's credibility. *See State v. Abdullah*, 10th Dist. No. 05AP-1316, 2006-Ohio-5412, ¶ 36 (where the challenged cross-examination attempted to cast doubt upon the witness's credibility but defense counsel's strategy failed when he encountered damaging answers, the appellate court held that "an unsuccessful strategy does not render counsel's assistance constitutionally ineffective"); *State v. Broadnax*, 2nd Dist. No. 18169, 2001 Ohio App. LEXIS 564, *6 (Feb. 16, 2001) (when cross-examination was intended to diminish the credibility of the witness but elicited damaging answers, it was still a proper tactical decision by counsel).

{¶25} Further, there was some value to counsel's strategy, since during the cross-examination, defense counsel was able to show that Marcy contradicted herself and revealed lies made in her statement to the police, including the statement that only Googe had manufactured the drugs. Counsel also was able to point to Marcy's potential motive or incentive for lying, that she was testifying in exchange for a more lenient sentence. It cannot be said that, even if some negative information came out during cross-examination, counsel was ineffective in his cross-examination of Marcy.

{¶26} Even if trial counsel's performance had been deficient, however, we cannot find that prejudice resulted. *See State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 102 (where the jury had before it testimony similar to that elicited by defense counsel during cross-examination, no prejudice resulted from such potentially damaging testimony). Marcy had already given, during direct examination, a statement that Arcaro had brought over the various items used to manufacture the

9

methamphetamine, as she explained in cross-examination. Additionally, she had already stated that she had purchased meth from Arcaro after it was made, which was similar to the testimony that he was selling the meth to different individuals. Further, such testimony was not even necessary to establish whether Arcaro was manufacturing methamphetamine.

{¶27} The first assignment of error is without merit.

{¶28} In his second assignment of error, Arcaro argues that the guilty verdict was against the weight and sufficiency of the evidence because the sole evidence that Arcaro was manufacturing methamphetamine came from Marcy's unreliable testimony. There was no physical evidence connecting Arcaro to the manufacture, and the police did not observe him manufacturing the methamphetamine.

{¶29} The State argues that the testimony of Marcy, coupled with the existence of the meth lab, the trash thrown away by Arcaro, and the plastic acorn found in his possession, were sufficient to support a conviction.

{¶30} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury," i.e., "[w]hether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary (6 Ed.1990) 1433. In reviewing the sufficiency of the evidence to support a criminal conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

10

{¶31} Weight of the evidence, in contrast to its sufficiency, involves "the inclination of the greater amount of credible evidence." (Citation omitted.) (Emphasis deleted.) *Thompkins* at 387. Whereas the "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." (Citation omitted.) *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "In other words, a reviewing court asks whose evidence is more persuasive -- the state's or the defendant's?" *Id.* The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses, to determine whether, "in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Citation omitted.) *Thompkins* at 387.

{¶32} "Since there must be sufficient evidence to take a case to the jury, it follows that 'a finding that a conviction is supported by the *weight* of the evidence necessarily must include a finding of sufficiency.'" (Emphasis sic.) *Willoughby v. Wutchiett*, 11th Dist. No. 2002-L-165, 2004-Ohio-1177, ¶ 8, quoting *State v. Roberts*, 9th Dist. No. 96CA006462, 1997 Ohio App. LEXIS 4255, *5 (Sept. 17, 1997); *Thompkins* at 388 ("[a] reversal based on the weight of the evidence * * * can occur only after the State both has presented *sufficient evidence* to support conviction and has persuaded the jury to convict") (emphasis sic), quoting *Tibbs v. Florida*, 457 U.S. 31, 42-43, 102 S.Ct. 2211, 72 L. Ed.2d 652 (1982).

{¶33} In order to convict Arcaro of Illegal Manufacture of Methamphetamine, the State was required to prove, beyond a reasonable doubt, that he "knowingly

11

manufacture[d] or otherwise engage[d] in any part of the production of a controlled substance," in the present matter, methamphetamine. R.C. 2925.04(A).

{¶34} Arcaro's primary argument regarding why his conviction was not supported by the evidence is that Marcy was the only witness who saw him allegedly manufacturing drugs and she was not credible, due to her conflicting statements and because she was under the influence of methamphetamine on October 22. However, it must initially be emphasized that the determination of a witness' credibility lies with the finder of fact and an appellate court may not substitute its own judgment for the jury's. *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). "[T]he factfinder is free to believe all, part, or none of the testimony of each witness appearing before it." (Citation omitted.) *State v. Higginbottom*, 11th Dist. No. 2012-P-0028, 2012-Ohio-5834, ¶ 55. Although there were some inconsistencies between Marcy's statement to the police and her testimony at the trial, Marcy explained that she was initially hesitant to state that Arcaro was manufacturing methamphetamines because they were friends, but she later decided that "it was the right thing to do." Based on such statements, the jury was in the best position to determine how much credibility she had and how much weight to give her testimony.

{¶35} Marcy's testimony established that she personally witnessed Arcaro shaking the soda bottle used to make the meth and helping to release gasses or smoke from the bottle, also a step in the meth making process. She also saw him weigh the meth on a scale. She testified to providing Arcaro with pseudoephedrine, an ingredient necessary for making meth, and he told her he was using that item to manufacture the

12

meth. All of this testimony, if believed by the jury, supported a conclusion that Arcaro manufactured methamphetamine.

{¶36} This testimony, and Arcaro's conviction, are further supported by Patrolman Rose's testimony that Arcaro had been in Marcy's apartment on October 22, where the meth lab was discovered. There is no dispute that a meth lab did exist inside of Marcy's apartment. Additionally, Arcaro had entered and exited the apartment on that date on several occasions, carrying different bags, and also threw away the garbage that contained several items commonly used in the manufacture of methamphetamine. Upon the stop of Schaffer's vehicle, following the collection of the meth items in the garbage, Patrolman Rose's dog alerted near Arcaro's position in the car. In addition, Patrolman Rose testified that Arcaro was found with an acorn shaped container which smelled like meth and was similar to a container found in the garbage bags as well. Although this evidence alone does not establish the manufacture of methamphetamine, when combined with the testimony of Marcy, we cannot find that there was insufficient evidence to convict Arcaro of Illegal Manufacture of Methamphetamine or that his conviction was against the weight of the evidence, since he knowingly manufactured and engaged in the production of methamphetamine.

{¶37} As to Arcaro's contention that there was no physical evidence, such as fingerprints or DNA on the items used to manufacture the methamphetamine, we note that the officers testified that most of the items could not be tested for such evidence because they had to be destroyed, due to contamination from the chemicals and the danger they posed. Further, it must be emphasized that no physical evidence was required in order to convict Arcaro for Illegal Manufacture, especially given all of the

13

foregoing evidence. "[P]hysical evidence is not required to sustain a criminal conviction." (Citations omitted.) *State v. Long*, 11th Dist. No. 2007-P-0105, 2008-Ohio-2919, ¶ 29.

{¶38} The second assignment of error is without merit.

{¶39} For the foregoing reasons, the judgment of the Ashtabula County Court of Common Pleas, finding Arcaro guilty of Illegal Manufacture of Methamphetamine, is affirmed. Costs to be taxed against appellant.


TIMOTHY P. CANNON, P.J.,

COLLEEN MARY O'TOOLE, J.

concur.