[Cite as *State v. Gibbs*, 2022-Ohio-4792.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- v -

CHRISTOPHER LLOYD GIBBS,

        Defendant-Appellant.

**CASE NO. 2022-A-0042**

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2020 CR 00349

## O P I N I O N

Decided: December 30, 2022
Judgment: Affirmed

*Colleen M. O'Toole*, Ashtabula County Prosecutor, and *Jessica Fross*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Edward F. Borkowski, Jr.*, P.O. Box 609151, Cleveland, OH 44109 (For Defendant-Appellant).

JOHN J. EKLUND, P.J.

{¶1} Appellant, Christopher Gibbs, appeals from the Ashtabula County Court of Common Pleas. Appellant was convicted of Aggravated Vehicular Homicide in violation of R.C. 2903.06(A)(2)(a) and (B)(3), a high tier felony of the third degree with a maximum sentence of 60 months; Failure to Stop After an Accident in violation of R.C. 4549.02(A)(2), a felony of the third degree; and Obstructing Official Business in violation of R.C. 2921.31(A), a misdemeanor of the second degree.

{¶2} Appellant assigns two errors: first, that his convictions were against the manifest weight of the evidence where there were no witnesses to the crash and no

physical evidence connecting appellant to the crash, and second, that the trial court improperly sentenced appellant.

{¶3} After review of the record and the applicable caselaw, we find appellant's assignments of error are without merit. Although there was no physical evidence or direct testimony that appellant was driving the vehicle involved in the fatal accident, appellant typically drove the vehicle, was seen driving the vehicle that evening, and, contrary to his assertions, his cell phone data indicated that he was in the area of the crash. Further, the trial court did not err in sentencing appellant.

{¶4} Therefore, we affirm the judgment of the Ashtabula County Court of Common Pleas.

## Substantive and Procedural History

{¶5} The victim in this matter is Lloyd Gibbs, appellant's brother. The two lived five minutes away from each other in Ashtabula County. Appellant lived with his father, Lloyd L. Gibbs, his father's girlfriend, Donna, and William Bailey. The Victim lived with his wife, Julie, and their children.

{¶6} On July 1, 2019, Lloyd had hay that he needed to sell at the market. Lloyd asked appellant to take the hay to the market and bring back the money from the sale.

{¶7} Julie Gibbs, testified. Julie said that appellant drove a truck most of the time but that he would also drive a Ford Fusion. Both vehicles were titled in appellant's father's name, Lloyd L. Gibbs. Julie explained that appellant did not have any vehicles titled in his name because he did not have a driver's license.

{¶8} Julie said that appellant came to the house three times in the afternoon to look for his brother Lloyd, who was not at home. On the third visit, appellant left the money

2

from the sale of the hay. The receipt for the hay indicated appellant sold it for $250 while appellant left less than that amount. Julie said that appellant came to the house in the Fusion two times that evening and the third time he came in the truck.

{¶9} Julie said that Lloyd came home around 10:00 p.m. and shortly thereafter said he was going to drive to his father's house. Lloyd L. Gibbs and appellant lived together. She said that Lloyd drove his motorcycle to the house and did not return after a few hours. Lloyd did not answer his phone or return texts and she became worried. Julie, her oldest son Cody, and her nephew Terry left the house to look for Lloyd.

{¶10} As they were driving toward appellant's house, they saw Lloyd's motorcycle lodged in an upright position in the front end of the Fusion. The Fusion's front end was wrapped around the motorcycle, up to the motorcycle's fuel tank. Lloyd was lying in the middle of the road unresponsive. No one else was present at the scene of the crash.

{¶11} Julie testified that, after seeing her husband's body in the road, she was overcome with emotion and Cody drove her home while Terry waited at the scene for paramedics. Once home, Julie called her father-in-law, Lloyd L. Gibbs, and told him his vehicle had been involved in an accident. She said that Lloyd L. Gibbs was in Barberton, Ohio at the time helping his girlfriend move.

{¶12} Julie testified that EMS transported Lloyd to the hospital, where he remained unconscious for ten days before passing away.

{¶13} Julie's son, Cody Bowen testified about the events at the scene of the crash. He also stated that appellant is the person who typically drives the Fusion although it is registered in Lloyd L. Gibb's name.

3

**{¶14}** Trooper Jason Hayes responded to the scene. He testified that he took pictures, measurements, and interviewed witnesses. Hayes said that he contacted the owner of the vehicle, Lloyd L. Gibbs and determined that he was out of town at the time of the crash.

**{¶15}** Hayes described the crash as unusual because the motorcycle had stuck upright into the front end of the Fusion. He also said that he observed tire marks on the road caused by the motorcycle indicating an impact, but did not see similar tire marks caused by the Fusion until just before the vehicles came to a final resting position. Hayes stated that blood found at the scene had already begun to coagulate, which indicated it was not fresh.

**{¶16}** William Bailey testified that both he and appellant regularly drove the Fusion. He said that Lloyd L. Gibbs only sometimes drove the Fusion. The keys for the Fusion were kept in the basement near Bailey's and appellant's computers.

**{¶17}** Bailey said that around 10:00 p.m. he was startled when the Fusion pulled out in a "very rapid manner. I mean, they had the hammer down whenever it peeled out of the driveway yeah, it made enough noise that I could hear it over my TV and the fan that was in the window." After hearing this, Bailey texted appellant "what the hell now??? Be careful whatever that was about[.]" Sixteen minutes later, he texted "what are you doing??? Let me know something!!!" Bailey later had a phone conversation with appellant. In that conversation, appellant told Bailey to report the Fusion stolen. At 1:29 a.m. Appellant texted Bailey that he believed he was being punished by his father and brother in reference to the hay sale because "apparently I wasn't supposed to get half the money…idk[.]"

4

{¶18} Lloyd L. Gibbs testified he was out of town on July 1, 2019. He said that he owned three vehicles, one for his use, the truck for farm use, and the Fusion. He said he kept his own set of keys for the Fusion and that appellant was responsible for the second set.

{¶19} Michael Fogle testified he had been at appellant's house during the day to play video games. He said appellant left and came back but was acting "nervous, * * * like just shaky." He said appellant had the demeanor of somebody who is "trying to hide something." He said appellant used the truck to take Fogle back to his home in Geneva late that evening.

{¶20} The State called Thomas Rice who said he went to appellant's house around 10:15 p.m. on July 1, 2019. Appellant was not there but Rice spoke to him on the phone. Appellant asked Rice to report the Fusion as stolen. Rice did not feel comfortable doing this. He also said that appellant "sounded frantic, like he really didn't know what to do or what to say." Rice left the house soon after this phone call.

{¶21} Grace Buell testified appellant arrived at her apartment around 11:30. Buell lived with appellant's friend, Tyler Barr. Barr was not home at the time appellant came, so she texted Barr, "Why is Chris here?" Barr responded, "idk" and Buell texted, "He came to see us he missed us" to which Barr texted, "That's weird[.]" Buell testified that appellant's unannounced presence was "unexpected" and "weird." She also said appellant's demeanor was "more stiff, more alert. Just weird in general. Not his usual self as any other time he's come over." Buell said that appellant stayed the night at their apartment and was leaving as police officer showed up to arrest him in the parking lot.

5

{¶22} Trooper Brian Fox testified as a crash reconstruction expert. Fox observed the scene after the crash and took measurements of the scene including the grade of the road, the position of tire marks, and the final resting position of the vehicles. He used computer programs with these measurements and the information about the make and model of the vehicle in the crash to generate his report. He stated that the motorcycle made a single tire mark for 188 feet before the Fusion tire marks began. This indicated that the Fusion did not begin braking immediately after impact. Fox said that in a typical crash, braking begins shortly after impact.

{¶23} Doctor Todd Barr, a forensic pathologist working at the Cuyahoga County Medical Examiner's office, testified that Lloyd died from multiple blunt force traumas caused by the motor vehicle accident.

{¶24} Stacy Violi, a forensic scientist from the Ohio Bureau of Criminal Investigation, testified about her testing of DNA samples taken from the scene of the crash. She said one of the Fusion's air bag samples contained too many individuals' DNA to differentiate between profiles. Additionally, she stated that the remaining swabs taken from the airbag did not provide a DNA profile of a sufficient quality for comparison due to insufficient data. Violi stated she was not surprised by these results because the airbag samples did not have blood or bodily fluid DNA on them. Instead, the samples were only touch samples, which prove more difficult to obtain conclusive results. She said that in her experience, air bag DNA results are often mixed.

{¶25} Alex Nichols, from the Ohio State Highway Patrol intel unit, testified as an expert in cell phone analysis. Nichols analyzed appellant's Sprint cell phone data and his Snap Chat location data. Nichols said that the data from Sprint is limited to estimated

6

device locations, meaning that a device can be anywhere within a certain radius of a cell tower and that a phone might connect to multiple, overlapping tower signals. Nichols stated that the Sprint cell tower data and the Snap Chat data were consistent with each other and contributed to the confidence of his opinions.

{¶26} Based on the data he reviewed, Nichols' opinion was that appellant's cell phone was within range of the crash site at the time of the crash. After that, the data indicates that the phone traveled north, in line with appellant dropping Fogle off and his trip to Buell's residence.

{¶27} Finally, the State called Trooper Michael Royko, a criminal investigator with the Ohio State Highway Patrol. Royko acted as the lead investigator for the crash and testified about his investigation. Royko said he learned of appellant's location from Bailey and went to Buell's apartment on the morning after the crash. Appellant was still present. Royko placed appellant in custody and interviewed him. During the interview, appellant said he had arrived at Buell's apartment before sunset the night before. On July 1, sunset was at 9:01 p.m.

{¶28} Royko said that he focused on appellant as the primary suspect during his investigation. Although he investigated the possibility that the Fusion was stolen, Royko said that claim was "doubtful." In order to steal the Fusion, someone would have had to go

> into a house in a very rural setting, go down into the basement, because based on our investigation we knew that the keys were down in the basement. Would have to go down into the basement at a time when somebody was home * * * Then go and steal the vehicle, drive down Sodom Road and for whatever reason that person who stole the car would then have to turn around and go back in the direction that they just stole the vehicle from. It was very unlikely. * * * [W]e did not think that this was a stolen vehicle.

7

{¶29} The State rested its case in chief and appellant called one witness, Robert Aguero, as an expert witness in the area of cell phone data and forensics. Aguero said that he owns a company providing cell phone forensics and cell tower data analysis.

{¶30} Aguero analyzed a smaller set of data than Nichols used as the basis for his analysis. Aguero used "voice activity" cell tower data derived from calls made during the time frame of the crash. Aguero stated that the cell data from Sprint "is not specific enough to say the phone is at any one given location. It only gives us broad areas where a phone could be located." He said that voice activity is the only way to reliably determine the location of the phone because it guarantees there has been a connection with the tower.

{¶31} He also stated that he only analyzed one minute's worth of Snap Chat activity "to show how inaccurate the data is." Aguero said the Snap Chat data revealed physical impossibilities such as the phone's location moving 0.9 miles in six seconds. He did agree that the Snap Chat data could be used to determine a phone's general location.

{¶32} Aguero conceded that the cell call data both in both expert's reports generated the "same mapping on both our maps." He said that the accident site and appellant's house were within the range of the phone's estimated location at the time of the crash.

{¶33} The jury found appellant guilty on all counts and the matter was set for sentencing. At sentencing, the trial court imposed a 60-month sentence for Aggravated Vehicular Homicide, a 36-month sentence for Failure to Stop After an Accident, and a 90-day sentence for Obstructing Official Business. The court imposed consecutive sentences

8

on the felony convictions and a concurrent sentence on the misdemeanor Obstructing Official Business for a total sentence of eight years.

**{¶34}** Appellant timely appealed and raises two assignments of error.

### Assignments of Error and Analysis

**{¶35}** Appellant's first assignment of error states:

**{¶36}** "[1.] Appellant's Convictions Were Against the Manifest Weight of the Evidence."

**{¶37}** Appellant argues that his conviction is against the manifest weight of the evidence because the State failed to provide direct evidence that he committed the crimes. Appellant denied being present and there were no (surviving) eyewitnesses to say that he was driving. Further, DNA evidence from the scene was inconclusive and appellant presented evidence through an expert witness that cell phone data can only broadly indicate the location of a phone.

**{¶38}** "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." *Thompkins,* 78 Ohio St. 3d at 389. Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them." (Emphasis sic.) *Id.* at 386, quoting Black's Law Dictionary 1594 (6th Ed.1990).

9

Case No. 2022-A-0042

{¶39} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.*

{¶40} The reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶41} The trier of fact is the sole judge of the weight of the evidence and the credibility of the witnesses. *State v. Landingham*, 11th Dist. Lake No. 2020-L-103, 2021-Ohio-4258, ¶ 22, quoting *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). The trier of fact may believe or disbelieve any witness in whole or in part, considering the demeanor of the witness and the manner in which a witness testifies, the interest, if any of the outcome of the case and the connection with the prosecution or the defendant. *Id.,* quoting *Antil* at 67. This court, engaging in the limited weighing of the evidence introduced at trial, is deferential to the weight and factual findings made by the jury. *State v. Brown*, 11th Dist. Trumbull No. 2002-T-0077, 2003-Ohio-7183, ¶ 52, citing *Thompkins* at 390 and *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph two of the syllabus.

10

Case No. 2022-A-0042

**{¶42}** A finding that a judgment is supported by the manifest weight of the evidence necessarily means the judgment is supported by sufficient evidence. *State v. Arcaro*, 11th Dist. Ashtabula No. 2012-A-0028, 2013-Ohio-1842, ¶ 32.

**{¶43}** In this case, appellant was convicted of Aggravated Vehicular Homicide in violation of R.C. 2903.06(A)(2)(a) and (B)(3), Failure to Stop After an Accident in violation of R.C. 4549.02(A)(2), a felony of the third degree; and Obstructing Official Business in violation of R.C. 2921.31(A), a misdemeanor of the second degree.

**{¶44}** R.C. 2903.06(A)(2)(a) provides:

(A) No person, while operating or participating in the operation of a motor vehicle, motorcycle, snowmobile, locomotive, watercraft, or aircraft, shall cause the death of another or the unlawful termination of another's pregnancy in any of the following ways:

\* \* \*

(2) In one of the following ways:

(a) Recklessly;

**{¶45}** R.C. 4549.02 provides in pertinent part:

(A)(1) In the case of a motor vehicle accident or collision with persons or property on a public road or highway, the operator of the motor vehicle, having knowledge of the accident or collision, immediately shall stop the operator's motor vehicle at the scene of the accident or collision. The operator shall remain at the scene of the accident or collision until the operator has given the operator's name and address and, if the operator is not the owner, the name and address of the owner of that motor vehicle, together with the registered number of that motor vehicle, to all of the following:

(a) Any person injured in the accident or collision;

(b) The operator, occupant, owner, or attendant of any motor vehicle damaged in the accident or collision;

(c) The police officer at the scene of the accident or collision.

11

Case No. 2022-A-0042

(2) In the event an injured person is unable to comprehend and record the information required to be given under division (A)(1) of this section, the other operator involved in the accident or collision shall notify the nearest police authority concerning the location of the accident or collision, and the operator's name, address, and the registered number of the motor vehicle the operator was operating. The operator shall remain at the scene of the accident or collision until a police officer arrives, unless removed from the scene by an emergency vehicle operated by a political subdivision or an ambulance.

{¶46} R.C. 2921.31(A) provides:

No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

{¶47} Appellant argues that the jury lost its way because there was no direct evidence that appellant was driving the car at the time of the crash. We disagree.

{¶48} Here, the State's evidence relied on circumstantial evidence that appellant was driving the Fusion and subsequently left the scene of the accident. "Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus. Circumstantial evidence is not based on personal knowledge or observation, but on "facts from which inferences are drawn, showing indirectly the facts sought to be established." *State v. Blazo*, 11th Dist. Lake No. 2019-L-094, 2020-Ohio-4636, citing *State v. Nicely*, 39 Ohio St.3d 147, 150, 529 N.E.2d 1236 (1988). Where a conviction is based on circumstantial evidence, "that evidence must prove collateral facts and circumstances, from which the existence of a primary fact may be rationally inferred according to common experience." *State v. Windle,* 11th Dist. Lake No. 2010-L-033, 2011-Ohio-4171, ¶ 34.

12

Case No. 2022-A-0042

{¶49} On the night of the crash, Julie Gibbs stated that she saw appellant three times when he drove to her house. Two of those times, he drove the Fusion. Julie said that Lloyd left the house on his motorcycle around 10:00 p.m., which was about the same time that appellant's housemate, William Bailey was startled by the Fusion peeling out of the driveway. Bailey texted appellant, "what the hell now? Be careful whatever that was about." After the time of the crash, appellant texted Bailey that he believed he was being punished by his father and brother in reference to the hay sale because, "apparently I wasn't supposed to get half the money…idk[.]"

{¶50} Appellant also called Bailey and Thomas Rice about the Fusion being stolen; however, appellant himself did not report it stolen. Neither Bailey nor Rice felt comfortable reporting the vehicle stolen on appellant's behalf. Trooper Royko testified that appellant's stolen vehicle claims were "doubtful" and described in detail the improbable set of circumstances that would have been necessary for such a theft to occur.

{¶51} Rice said when he talked to appellant, he "sounded frantic." Others, such as Michael Fogle and Grace Buell similarly described appellant's demeanor as "nervous," "trying to hide something," or "weird in general." Fogle also noted a change in appellant's demeanor which corresponded to the time of the crash. Buell noted that appellant's unannounced appearance at her house was unusual. Appellant also lied to Royko about when he arrived at Buell's house. Appellant told Roko he arrived before sunset. However, his cell phone data and witnesses' testimony both indicated he was still at his own residence for at least an hour after sunset.

13

**{¶52}** Multiple law enforcement officers commented that the tire marks at the scene were not typical. Trooper Fox in particular said that the driver of the Fusion failed to brake for 188 feet after striking the motorcycle.

**{¶53}** Appellant's cell phone expert Aguero said the phone data was not specific enough to say where appellant's phone was located at the time of the crash. However, he did not testify that the data excluded appellant's phone from the crash. Further, Aguero analyzed less data than Nichols, the State's expert. Far from an alibi, Aguero's testimony was offered to diminish the weight of the State's own expert. However, Nichols acknowledged that the Sprint and Snap Chat data could only give an estimated device location. Nichols' conclusion was that, based on that estimated location data, appellant's cell phone was within range of the crash during the time of the crash and then moved north. Aguero did not contradict this conclusion.

**{¶54}** This evidence is the kind of indirect evidence from which a jury can draw natural inferences of guilt. Particularly, the evidence was such that a trier of fact could conclude that appellant was driving the Fusion at the time of the accident, that appellant left the scene and went to Buell's house to spend the night, and that appellant obstructed the investigation. This is not the exceptional case where the evidence weighs heavily against conviction. Appellant's conviction was supported by the manifest weight of the evidence.

**{¶55}** Accordingly, appellant's first assignment of error is without merit.

**{¶56}** Appellant's second assignment of error states:

14

{¶57} "[2.] Appellant's Sentence is Contrary to Law Because the Trial Court Failed to Properly Consider and Weight the Relevant Statutory Factors, and Because the Record Does Not Clearly and Convincingly Support Consecutive Sentences."

{¶58} Appellant raises two issues in this assignment of error. First, that the trial court did not properly weigh the purposes and principles of felony sentencing contained in R.C. 2929.11 and R.C. 2929.12. Second, that the record does not clearly and convincingly support the rebuttal of the presumption of concurrent sentences.

**Purposes and Principles of Felony Sentencing:**

{¶59} Appellant cites R.C. 2953.08(G)(2)(a) as our standard of review for felony sentencing matters. However, division (G)(2)(a) of that statute only applies to challenges to sentences imposed under R.C. 2929.13(B) or (D), R.C. 2929.14(B)(2)(e) or (C)(4), and R.C. 2929.20(I). Appellant's R.C. 2929.11 and R.C. 2929.12 challenges are not proper under R.C. 2953.08. *See State v. Shannon*, 11th Dist. Trumbull No. 2020-T-0020, 2021-Ohio-789, ¶ 7.

{¶60} We reiterate our prior holdings, and admonish all counsel in this district to observe, R.C. 2953.08(G)(2)(a) does not provide a basis for an appellate court to modify or vacate a sentence based on the lack of support in the record for the trial court's findings under R.C. 2929.11 and 2929.12. *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.2d 649, ¶ 27-29; *e.g., State v. Reffitt*, 11th Dist. Lake No. 2021-L-129, 2022-Ohio-3371; ¶ 17; *State v. Stevens*, 11th Dist. Lake No. 2021-L-105, 2022-Ohio-3781, ¶ 19; *State v. Pruitt*, 11th Dist. Trumbull No. 2021-T-0012, 2021-Ohio-3793, ¶ 10; *State v. Loparo*, 11th Dist. Lake No. 2020-L-120, 2021-Ohio-2179, ¶ 13; *State v. Mizicko*, 11th Dist. Trumbull No. 2021-T-0017, 2022-Ohio-262, ¶ 22; *State v. Potter*, 11th Dist. Lake

15

Case No. 2022-A-0042

No. 2021-L-053, 2021-Ohio-3485, ¶ 7. The fundamental premise of all the above precedents is that R.C. 2929.11 and R.C. 2929.12 are not statutes to which R.C. 2953.08(G)(2)(a) even refers. More fundamentally, neither R.C. 2929.11 nor R.C. 2929.12 call for the sentencing court to even make "findings."

{¶61} Under *Jones*, an appellate court reviewing alleged error under R.C. 2929.11 and R.C. 2929.12 no longer evaluates whether those sentences are unsupported by the record. Instead, the court "must simply analyze whether the sentencing court's findings for those sentences are contrary to law." *Id.* at ¶ 11. *Jones* held that "legal dictionaries define 'contrary to law' as 'in violation of statute or legal regulations at a given time,' *e.g., Black's Law Dictionary* 328 (6th Ed. 1990)." *Id.* at ¶ 34. However, *Jones* held that the phrase "contrary to law" is not "equivalent" to an "appellate court's conclusions that the record does not support a sentence under R.C. 2929.11 or 2929.12." *Id.*

{¶62} Appellant concedes that his sentence falls within the statutory range, but argues, contrary to *Jones*, that the court did not properly weigh the purposes and principles of felony sentencing in R.C. 2929.11(A) and did not properly assess the serious and recidivism factors of R.C. 2929.12. Appellant's argument fails because we may not independently weigh the evidence in the record and substitute our judgment for the trial court's. *Id.* at ¶ 42.

**Consecutive Sentences:**

{¶63} Next, appellant challenges his consecutive sentences.

{¶64} There are three ways an appellant can challenge consecutive sentences on appeal. *State v. Lewis*, 11th Dist. Lake No. 2001-L-060, 2002-Ohio-3373, ¶ 6. First, the appellant may argue that the sentencing court failed to state the findings for consecutive

16

sentences that R.C. 2929.14(C)(4) requires. *State v. Torres*, 11th Dist. Lake No. 201-L-122, 2003-Ohio-1878, ¶ 18; R.C. 2953.08(G)(1). Second, the appellant may argue that the record clearly and convincingly does not support the findings the sentencing court made to justify consecutive sentences. *State v. Lewis*, at ¶ 7; R.C. 2953.08(G)(2)(a). Third, the appellant may argue that his sentence is clearly and convincing otherwise contrary to law. R.C. 2953.08(G)(2)(b).

{¶65} R.C. 2929.14(C)(4) provides:

If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under postrelease control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶66} In making its findings for consecutive sentences, the sentencing court is required to engage in the analysis for consecutive sentencing and specify the statutory criteria warranting its decision. *State v. Bonnell*, 140 Ohio St. 3d 209, 2014-Ohio-3177,

17

Case No. 2022-A-0042

16 N.E.3d 659, at ¶ 26. While the sentencing court is not required to state exact reasons supporting its findings, the record must contain a clear basis upon which a reviewing court can determine that the sentencing court's findings for imposing consecutive sentences are supported by the record. Id. at ¶ 27-28.

{¶67} Here, appellant concedes that the trial court made the required findings for consecutive sentences. However, he argues that this is his first felony conviction and that his misdemeanor criminal history was comprised of non-violent and traffic offenses. He therefore believes that the record does not support the rebuttal of the presumption of concurrent sentences.

{¶68} We disagree. The record does not clearly and convincingly fail to support the trial court's imposition of consecutive sentences. The trial court said appellant has had "at least twelve contacts with the criminal justice system. Not all of which resulted in convictions, but notably four contacts after this incident including the other offense that he's going to be sentenced on today."

{¶69} That other offense was a felony failure to comply with an order or signal of a police officer in violation of R.C. 2921.331. The trial court was troubled by this subsequent charge because it was a felony vehicular offense involving risk of harm to others. The record shows that appellant's criminal history justified the trial court's determination that consecutive sentences were necessary to protect the public from future crime by appellant.

{¶70} Accordingly, appellant's second assignment of error is without merit.

Case No. 2022-A-0042

{¶71} For the foregoing reasons, the judgment of the Ashtabula County Court of Common Pleas is affirmed.

MATT LYNCH, J.,

FREDERICK D. NELSON, J., Retired, Tenth Appellate District, sitting by assignment, concur.

Case No. 2022-A-0042